**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Milton J. GARON, et al., Respondents.**

**No. 83–5271.**

United States Court of Appeals, Sixth Circuit.

Argued April 3, 1984.

Decided June 29, 1984.

Rehearing Denied Aug. 20, 1984.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Andrew Tranovich, argued, Washington, D.C., for petitioner.

Andrew Russell, argued, Smith & Smith, Milton J. Garon, Richard B. Bergman, Louisville, Ky., for respondents.

Before KENNEDY and CONTIE, Circuit Judges, and GIBSON, District Judge.*

* The Honorable Benjamin F. Gibson, United States District Judge for the Western District of Michigan, sitting by designation.

CONTIE, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order[1] finding that respondent Milton J. Garon and Richard B. Bergman d/b/a Autoglass and Upholstery Company (Autoglass) committed numerous violations of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), and discharged an employee in retaliation for union activity in violation of § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3). We enforce the Board's order.

## I.

Autoglass is a partnership of Milton J. Garon and Richard G. Bergman whose primary business is the replacement of automotive glass. Although it operates in thirteen locations in Kentucky, the events in question here took place at its shop in Louisville, Kentucky. The Louisville shop, in addition to replacing automotive glass, maintains a residential and light commercial plate glass replacement department.[2]

On April 6, 1981, the International Brotherhood of Painters and Allied Trades, Glaziers Local 1529, AFL–CIO, filed an election petition with the Board for a bargaining unit consisting of the glaziers, automotive glass installers and glass cutters in the Louisville shop. On Thursday, April 9, 1981, Richard Bergman, the chief officer of Autoglass, received a telephone call from a Board agent informing him of the petition. Autoglass received the petition by mail the following day.

Curt Rexroat had been employed by Autoglass as the lead installer in their plate glass department since November 1978. On Monday, April 13, 1981, he began a week's vacation. He returned to work on the following Monday, April 20. The next day, Tuesday, April 21, Rexroat was discharged.

On April 22, 1981, the union filed an unfair labor practice charge alleging that Rexroat's discharge violated § 8(a)(3) of the Act and that certain other actions taken by Autoglass after the filing of the election petition violated § 8(a)(1) of the Act. On this same day, the union and Autoglass stipulated an election date of May 20, 1981. Seven votes were cast in the election. Three employees voted for the union and three voted against it. One ballot was challenged and has remained sealed. That ballot was cast by Curt Rexroat. The ballot will be opened if it is determined that Rexroat was discharged in violation of § 8(a)(3) of the Act.

## II.

In responding to the petition for enforcement in this court, Autoglass' sole contention is that the findings of the Board are not supported by substantial evidence on the record considered as a whole. This case therefore involves only the application of the well-settled principles which control our standard of review of the Board's factual determinations.

The Act provides that the "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). Since courts are to review the "record considered as a whole," they must "take into account whatever in the record fairly detracts from" the Board's factual findings. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). That is, a court should deny enforcement when "it cannot conscientiously find that the evidence supporting [the] decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Id.* This court has summarized our standard of review as follows:

> Evidence is substantial if it is adequate, in a reasonable mind, to uphold the decision. Application of this standard requires the Court to consider the body of

---

**1.** The Board's order is reported at 264 N.L.R.B. 149 (1982).

**2.** The parties have stipulated that Autoglass' activities meet the jurisdictional requirements of the Act.

evidence which opposes the Board's decision, but prohibits the Court from conducting a *de novo* review of the record. The Court is further foreclosed from setting aside the agency's finding of fact if its findings were supported by substantial evidence, even though the Court may have reached a different conclusion had it originally decided the issue.

*Union Carbide Corp. v. NLRB*, 714 F.2d 657, 660 (6th Cir.1983) (citations omitted).

Additionally, credibility determinations are normally a function for the Board. *Krispy Kreme Doughnut Corp. v. NLRB*, 732 F.2d 1288 at 1290 (6th Cir.1984). Accordingly, "[t]he Board's choice between conflicting testimony will not be set aside simply because this court 'would justifiably have made a different choice had the matter been before it *de novo.*'" *Local Union No. 948, International Brotherhood of Electrical Workers v. NLRB*, 697 F.2d 113, 117 (6th Cir.1982) (quoting *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464). The precise standard of review applied to credibility determinations provides that they will be upheld if they are "reasonable," *see Local Union No. 948*, 697 F.2d at 117, or if they have a "rational basis," *see NLRB v. S.E. Nichols of Ohio, Inc.*, 704 F.2d 921, 923 (6th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983).[3]

### III.

■ Although Autoglass devotes most of its argument to the § 8(a)(3) charge, it also challenges the Board's finding of § 8(a)(1) violations. We find no basis for overturning the Board's factual findings relating to the § 8(a)(1) violations.

The Board found that Autoglass violated § 8(a)(1) by threatening to close the Louisville shop. Employee Daniel Harris testified that on April 9, 1981, the day that Bergman received the telephone call informing him of the election petition, Bergman asked Harris and another employee if they knew anything about a union. After the two employees denied any knowledge of a union, Bergman then stated that "if there is any truth to this phone call then I will have to shut this f***ing place down." Bergman admitted during his testimony that he asked the employees if they knew of a union but denied making the precise threat of closure attributed to him by Harris. Bergman testified that he merely stated that his partner Garon "would probably consider closing the place, but I need the business." The Board credited Harris' testimony, but noted that even under Bergman's version of the facts an unlawful threat of closure had been made. We agree. It cannot be doubted that a threat of closure restrains and coerces employees in the exercise of their rights under the Act. *See, e.g., Jervis Corp., Bolivar Division v. NLRB*, 387 F.2d 107, 112 (6th Cir. 1967).

A similar incident occurred on April 13, 1981. Employee William McMillin testified that on that day Bergman asked McMillin if he had heard any talk of a union and how he felt about unions. According to McMillin, Bergman then stated that he knew Rexroat and Bobby Grant were behind the union drive. McMillin testified that Bergman stated that he "had been pleased" with Rexroat but that Rexroat was now "messing up" and that "if the union got in, he would close down his plate glass department." Both Rexroat and Grant worked in the plate glass department. The Board

---

**3.** There is some inconsistency among this circuit's cases as to the precise articulation of this standard. *Compare S.E. Nichols*, 704 F.2d at 923 ("rational basis") *with Local Union No. 948*, 697 F.2d at 117 ("reasonable"). *See also NLRB v. ComGeneral Corp.*, 684 F.2d 367, 369 (6th Cir.1982) (per curiam) ("reasonable in light of the proven facts"). *See generally Local Union No. 948*, 697 F.2d at 117 n. 8; *id.* at 119–21 (Jones, Circuit Judge, concurring).

We need not decide in this case whether these differing articulations are incompatible and, if they are, which of the articulations reflects the correct standard. Applying what it arguably the least differential standard, the "reasonable" standard, we still conclude that the Board's credibility findings must be upheld.

credited McMillin's testimony of this event over Bergman's denial. There is no basis for questioning this credibility determination. Substantial evidence on the record considered as a whole thus supports the Board's finding that Bergman threatened to close down a department of the Louisville shop in retaliation for union activity in violation of § 8(a)(1).

Autoglass made other statements to employees concerning its knowledge of who was behind the union drive. These statements adequately support the Board's finding that Autoglass created an impression of surveillance in violation of § 8(a)(1). In addition to the April 13 conversation between Bergman and McMillin, Bergman also told Harris that he believed Rexroat was the union instigator and Garon told McMillin that he knew Rexroat was behind the union. Additionally, on April 20 Bergman asked Harris why he had signed a union authorization card, clearly implying that he knew as a fact that Harris had signed a union authorization card. These instances clearly support a finding that Autoglass created an impression of surveillance in violation of § 8(a)(1). *See, e.g., Dayco Corp. v. NLRB*, 382 F.2d 577, 579 (6th Cir.1967).

The Board also found that Autoglass engaged in unlawful interrogation of several employees. Three incidents noted above, the April 9 conversation between Bergman and Harris, the April 13 incident involving McMillin and the April 20 questioning of Harris about the union authorization card, supported a finding of coercive interrogation. Although questioning an employee is not per se unlawful, *see NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 548 (6th Cir.1984), we have no difficulty in upholding the Board's finding that these particular interrogations were coercive. It is significant that on two occasions the interrogation was accompanied by threats of closure and on each occasion the interrogation involved the chief operating officer of the company, Richard Bergman. Other important indicia of coercion were also present. Bergman did not assure the employees that there would be no retaliation and the untruthful responses of the employees[4] "demonstrated their natural fears about such questioning." *See NLRB v. Cement Transport, Inc.*, 490 F.2d 1024, 1028 (6th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974). *Cf. Homemaker Shops*, 724 F.2d at 549 (in absence of similar factors, Board incorrectly found questioning to be coercive).

The Board also found that Autoglass violated § 8(a)(1) by encouraging an employee to dissuade other employees from supporting the union. McMillin testified that on April 17, in response to a question by Bergman as to how he felt about unions, he told Bergman that his prior experience with a union had not been good. According to McMillin, Bergman then urged McMillin to "help me out and talk to the guys ... explain to them how the union hadn't done you any good." The Board credited McMillin's testimony as to the substance of this conversation and there is no basis for questioning this credibility finding. The events McMillin testified to, soliciting an employee to engage in anti-union activities, clearly violates § 8(a)(1). *See NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 621 (7th Cir.1981); *NLRB v. Stenum Manufacturing Co.*, 423 F.2d 737, 740 (6th Cir. 1970).

Finally, the Board found that Autoglass solicited employee grievances and impliedly promised to remedy them by granting benefits in violation of § 8(a)(1). Soon after the filing of the election petition, McMillin had to undergo surgery for a leg injury and was to miss several days of work. When McMillin was recuperating at home, Bergman asked McMillin about his financial situation and told him that Garon might be able to help McMillin financially. On other occasions, Bergman asked Autoglass employees if they were "happy" and

---

**4.** Harris and McMillin had previously attended a union meeting. Their denials of knowledge of union activity were thus untruthful.

encouraged them to come into his office to discuss any problems. We conclude that these actions, taken together, constitute a violation of § 8(a)(1). The timing of these solicitations of grievances and promises of benefits and the absence of similar actions prior to the advent of union activity, support a finding of a violation of § 8(a)(1).[5]

In conclusion, we find that substantial evidence on the record considered as a whole supports the Board's findings with respect to the § 8(a)(1) violations.

## IV.

■ Autoglass defended against the § 8(a)(3) charge by attempting to show that the decision to terminate Rexroat had been reached long before Rexroat, or any other employee, engaged in union activity. The Board, however, rejected this defense on the basis of credibility determinations.

Autoglass presented five witnesses who testified that they were present at a November 1980 meeting[6] at which it was decided that Rexroat and his supervisor, Harold Jones, would be terminated as soon as replacements could be found for them. According to these witnesses, whose recollections of the general course of the meeting coincided, the discussion of Rexroat and Jones began when someone suggested expanding the plate glass operation out of Louisville and into Autoglass' other locations. Sue Jewell, a marketing representative, strenuously objected to this suggestion because, from what she had heard, the plate glass department was performing so poorly that Autoglass might lose automotive customers at their other locations by expanding the plate glass department into those areas. She referred during the meeting to a prior conversation with Brad Nais-

er. Naiser then explained to those at the meeting that a Nationwide Insurance agent had told him that Autoglass did automotive work well but that many Nationwide agents were dissatisfied with Autoglass' plate glass work.[7] The Nationwide agent told Naiser, in effect, that Autoglass should stay with what it did well and not harm its business reputation by doing shoddy work in a separate but related field.

Those at the meeting testified that they then discussed the plate glass department's problems. At that time, the plate glass department consisted of supervisor Harold Jones, lead installer Rexroat and helper Bobby Grant. The consensus of those at the meeting was that Jones and Rexroat should be terminated as soon as replacements for them could be found.

Several internal memoranda dated between the November 1980 meeting and Rexroat's discharge lend some support to this defense. Memoranda dated December 5, 1980, January 28, 1981 and February 11, 1981 from general manager Michael Hobbs relate incidents of poor work performance by Rexroat. In a memorandum dated December 9, 1980 to Hobbs, Bergman refers to Jones and Rexroat as an "unhappy team of incompetents." The memorandum concludes by requesting that Hobbs "find us a new installer and change that department."

Memoranda relating specifically to Jones are also present in the record. Three memoranda, dated in March, June and December of 1980 reflect warnings given to Jones about poor work performance. The December memorandum states that Jones had until January 2, 1981 to improve his performance. Hobbs testified that during the conversation reflected in this memorandum

---

**5.** We do not decide whether any of these acts in isolation, and particularly the act of asking an employee if he is "happy," would support a finding of an illegal solicitation of grievances and promise of benefits. Rather, we base the finding of an illegal solicitation of grievances and promise of benefits upon the combined effect of these several actions.

**6.** The five who testified as to this meeting were Richard Bergman, Thomas Cooper, manager of

the car customizing division, Sue Jewell, marketing representative, Michael Hobbs, general manager, and Brad Naiser, sales manager.

**7.** Nationwide Insurance was, according to Autoglass' witnesses, responsible for a large amount of Autoglass' business. When an insured of Nationwide needed automotive or plate glass replaced, Nationwide often referred them to Autoglass.

he made it clear to Jones that Jones would be fired if he did not improve his work by that date. Jones was, in fact, fired on January 23, 1981.

Hobbs testified that he made attempts to find replacements for Jones and Rexroat following the November meeting. Jones was replaced by transferring a present employee, Terry Davis, who was a regional manager until that time, into the plate glass department. Hobbs testified that in seeking a replacement for Rexroat, he called the other Autoglass locations for possible recommendations and placed an advertisement in a newspaper. Eventually, Hobbs came into contact with Frank Hatfield. A memorandum from Hobbs dated March 4, 1981 states that Hatfield "might be able to replace Curt Rexroat who is not producing well nor teaching Bobby [Grant] enough to suit me." A memorandum from Hobbs dated March 13, 1981 records that Hobbs made Hatfield an offer of employment on that date. The memorandum continued:

> I explained the difficulties he would experience with Curt until I could terminate Curt but he said Curt didn't bother him. If Frank decides to come work for us it would be a great improvement of skill in plate. As soon as he decides I will make plans to let Curt go immediately.

Hatfield began working in the plate glass department on or about March 23, 1981.

Autoglass attempted to verify its version of Rexroat's discharge by referring to conversations that Bergman and Hobbs had with another local company engaged in a similar line of business, Louisville Plate Glass. Bergman learned from a business acquaintance at Louisville Plate Glass that Rexroat had inquired about working for that company. Hobbs testified that when Bergman relayed this information to him, he hoped that he could avoid the "distasteful task" of discharging an employee. He hoped that Louisville Plate Glass would simply hire Rexroat away from Autoglass. It is undisputed that Rexroat did in fact approach Louisville Plate Glass about employment.

Hobbs testified that he talked to Will Casper of Louisville Plate Glass on March 31, 1981 and that a memorandum in the record accurately reflects that conversation. According to Hobbs' testimony and the memorandum, Hobbs told Casper that Louisville Plate Glass should feel free to hire Rexroat and that they could have him as soon as April 13, 1981 or April 20, 1981. A memorandum dated April 8, 1981 from Bergman states that Bergman discussed Rexroat's situation with Hobbs on that date. It relates that Hatfield had complained to Bergman about working with Rexroat. The memorandum concludes by stating that Hobbs told Bergman that the matter "should come to a head by Friday, the 10th." Hobbs testified that he made that statement to Bergman because he believed that he would know by April 10 whether Louisville Plate Glass would hire Rexroat. If he learned that Louisville Plate Glass was not planning on hiring Rexroat, Hobbs planned to discharge Rexroat on Friday, April 10.

Hobbs testified that he called Casper again on the morning of Thursday, April 9. Casper informed Hobbs that Louisville Plate Glass had decided not to hire Rexroat. Will Casper also testified for Autoglass. He testified that he received such a call and that after he told Hobbs that Louisville Plate Glass would not hire Rexroat, Hobbs stated that "if that's the case, then we are planning on letting him go then." Casper, however, was unable to recall the precise date of this conversation. He stated that he knew that it was a Thursday because he recalled hearing from his glaziers on a Friday that a union election petition had been filed with Autoglass and, for a reason which he did not state, he remembered receiving the call from Hobbs the day before he learned of the election petition from his glaziers.

Hobbs testified that because Autoglass learned on April 9 that an election petition had been filed it did not proceed to discharge Rexroat on April 10. On the advice

of counsel, Autoglass delayed the discharge until Rexroat's personnel file could be reviewed. During the week of April 12, when Rexroat was on vacation, Autoglass' counsel reviewed Rexroat's file and recommended that Autoglass proceed with its planned termination. When Rexroat returned to work on Monday, April 20, neither Bergman nor Hobbs was in the office. Bergman was in the office the next day, April 21, and proceeded to discharge Rexroat.

Autoglass presented a large amount of evidence which tended to show that the decision to discharge Rexroat had been reached before Autoglass learned of its employees' interest in a union. The General Counsel's witnesses, however, contradicted certain key elements of this defense and the Board credited their testimony. We find no basis for disturbing this credibility determination.

The General Counsel's witnesses testified that Rexroat was active in the union drive. The testimony of Harris and McMillin was that Rexroat introduced the idea of bringing union representation into Autoglass. According to Rexroat, however, it was Harris and McMillin who brought up the idea. This conflicting testimony is largely irrelevant, however, because Harris, McMillin and Rexroat all testified that it was Rexroat who arranged a meeting between a representative of the union and Autoglass employees. Furthermore, it is undisputed that Rexroat signed a union authorization card. It is thus clear that even if Rexroat was not the originator of the idea of union representation at Autoglass, he was a leading force in bringing about the union election petition.

More important than Rexroat's actual role in organizing the union drive is the perception that Autoglass had of his role. As noted above, Harris and McMillin testified that on several occasions they were told by Bergman or Garon that the two partners knew that Rexroat was the driving force behind the union. Thus, whatever Rexroat's actual role in securing the union election petition, the General Counsel's witnesses clearly established that Autoglass believed that Rexroat played a leading role.

McMillin testified that on the Monday following the receipt by Autoglass of the election petition, Bergman told McMillin that he believed Rexroat to be the cause of the union petition. According to the credited testimony of McMillin, Bergman then said that *"he [Bergman] had been pleased with Curt, but that he is messing up ... If the union got in he would close down his plate glass department."* This testimony, that Bergman had no complaint with Rexroat until he became active in the union, directly contradicts Autoglass' defense that it had long been dissatisfied with the quality of Rexroat's work. Similarly, Harris testified that during the week of April 12, 1981 Bergman approached him and stated that he believed Rexroat was the driving force behind the petition because "Curt felt that his job was in jeopardy because of the new employee that he hired, Frank Hatfield. And then he said that ain't how it was, *that he had nothing bad planned for Curt."*

Also important is Rexroat's testimony. He testified that when Bergman fired him he challenged Bergman to "tell me the real reason that you are firing me." Bergman, in response, "just kind of smiled a bit." Several days after being discharged, Rexroat returned to Autoglass to pick up his last paycheck. Rexroat testified that while waiting for his paycheck he talked to supervisor Mike Reid. During the discharge session, Bergman had read from several written memoranda which purported to document Rexroat's poor work performance. One of the memoranda was written by Reid. While waiting for his paycheck, Rexroat told Reid that the memoranda appeared to have been written at the same time. Rexroat testified that Reid smiled and said to Rexroat that he was "smart enough to put two and two together." Rexroat testified that Reid also stated that he was instructed to write a memorandum on Rexroat. This testimony clearly points to fabrication by Autoglass. By crediting

this testimony, which the Board was entitled to do, much of Autoglass' evidence becomes suspect.

Hatfield's testimony is also highly damaging to Autoglass' defense. Hobbs, it will be recalled, testified that he told Hatfield that he would be working with Rexroat until Rexroat was fired and that he might have trouble working with Rexroat. Hatfield unequivocally denied being told by anyone that he was replacing Rexroat or that Rexroat was to be discharged. He also denied being told that he might have problems working with Rexroat. He testified that his understanding was that he was to replace Bobby Grant, who was to begin working in the automotive department and divide his time between plate glass and automotive glass work. When Hatfield began working in the plate glass department, Grant did, in fact, begin to work in the automotive department.[8]

Other evidence in the record supports the Board's crediting of the General Counsel's witnesses.

Although Autoglass' position was that it had reached a firm decision to discharge Jones and Rexroat in November 1980, the December 4, 1980 memorandum from Hobbs indicates that Jones was given until January 2, 1981 to better his performance. Conditioning Jones' future employment upon his improvement is entirely inconsistent with Autoglass' assertion that it had already decided to discharge him. Similarly, Autoglass has not explained why it waited until January 23, 1981 to discharge Jones. They did not need that long to find a replacement because Terry Davis, who eventually did replace Jones, was already an Autoglass employee.[9] It is also somewhat hard to believe that if Autoglass perceived Rexroat to be such a poor worker that he threatened to cost Autoglass the loss of a client as important as Nationwide,

it took such a long time to discharge him. The Administrative Law Judge repeatedly asked Autoglass witnesses for specific examples of how Rexroat's work affected Autoglass' relationship with Nationwide. The types of problems noted by the witnesses, such as poor scheduling of jobs, pertained more to Jones' supervisory duties than to Rexroat's duties. Finally, Hobbs testified that employees were generally given warnings before being discharged. Autoglass' records of personnel warnings and discharges bears out this testimony. It is undisputed that Rexroat was not given any warnings, unlike other employees.

The general circumstances of this case also support the Board's findings. The timing of Rexroat's discharge, which quickly followed the notice of the election petition, supports the inference that the discharge was for an unlawful motive. *See Jim Causley Pontiac v. NLRB*, 620 F.2d 122, 126 (6th Cir.1980). An employer's expression of hostility towards unionization, clearly present in this case by virtue of Autoglass' numerous violations of § 8(a)(1), also supports this inference. In conclusion, the Board's credibility determinations relating to the § 8(a)(3) charge are well supported by the record. Substantial evidence on the record considered as a whole supports the Board's conclusions.

## V.

Finding that the Board's findings are supported by the record, we grant enforcement of the Board's order.

---

**8.** Similarly, Autoglass introduced a memorandum from Bergman dated April 8, 1981 which states that Hatfield had complained to Bergman about problems encountered by Hatfield in working with Rexroat. Hatfield denied making these complaints to Bergman, thus impeaching the integrity of the memorandum.

**9.** Indeed, Hobbs testified that within the week following the November meeting he began discussing with Davis the fact that he would have to replace Jones in the plate glass department.