946 F.2d 895
 138 L.R.R.M. (BNA) 2696
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
TRIEC, INC., Respondent.
 No. 91-5195.
 United States Court of Appeals, Sixth Circuit.
 Oct. 24, 1991.
 
 Before MILBURN and SUHRHEINRICH, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Petitioner National Labor Relations Board ("Petitioner" or "Board") seeks enforcement of its order issued on November 21, 1990, against respondent Triec, Inc. The decision and order of the Board, which adopts the recommended order of the administrative law judge ("ALJ"), found that Triec committed numerous violations of section 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), and one violation of section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). The Board's decision and order is reported at Triec, Inc., 300 N.L.R.B. 91 (1990).
 
 
 2
 The issues raised in this appeal by the respondent are (1) whether there was substantial evidence in the record to support the Board's finding that respondent promised and/or granted benefits in its revised employee handbook in order to undermine Union support; (2) whether there is substantial evidence in the record to support the Board's finding that respondent coercively interrogated Jeff Tackett, James Powell, and Michael Parks; (3) whether there was substantial evidence in the record to support the Board's finding that respondent unlawfully threatened and intimidated employees at the company meetings held on June 6, June 12, July 21, and August 9, 1989; and (4) whether a bargaining order was the appropriate remedy in the instant case even if one assumes that all the Board's findings with respect to the aforementioned allegations are affirmed. For the reasons that follow, we enforce the Board's order.
 
 I.
 A.
 
 3
 Triec, Inc. ("respondent" or "company") is a small electrical contracting company located in Springfield, Ohio. The company's stockholders ("owners") are Scott Yeazell, Dennis Jones, and Daniel Heaton. Yeazell is the president and handles administrative matters, Heaton is an electrician who operates in the field, and Jones is in charge of marketing and customer relations.
 
 
 4
 In March, 1989,[1] Triec employee Michael Parks contacted International Brotherhood of Electrical Workers ("IBEW" or "Union") representative Thomas Williams about Union representation. During March, April, and part of May, the Union held an unspecified number of meetings for Triec employees at its hall and at Parks' home. Sometime during the month of May, six of the ten employees of the appropriate bargaining unit at Triec signed valid authorization cards. On June 21, the company hired two additional employees, and one of them signed an authorization card. However, on June 30, Michael Parks, who had signed an authorization card, left the company. Thus, by the end of June, six of the eleven employees in the bargaining unit had signed authorization cards, and this fact is undisputed.
 
 
 5
 On June 3, the Union sent a letter to the company enclosing copies of the authorization cards and requesting recognition and bargaining. By letter dated June 9, Triec stated it did not believe the Union represented a majority and refused to bargain. On July 7, the Union petitioned for an election, and an election was set for August 10. However, on August 10, only two of the eleven employees voted for the Union. On August 4 and November 1, 1989, the Union filed charges alleging unfair labor practices.
 
 B.
 
 6
 Triec contends that it had no knowledge of a Union campaign among its employees until June 2, after it decided to implement new benefits, when salesman Keith Holmes left its employ for a higher paying job stating that Triec would be unable to offer the same wages because it was about to be Unionized. The ALJ, however, based on the following facts, found that Triec had knowledge of a Union campaign by mid-May, before it decided to implement new benefits.
 
 
 7
 It is undisputed that in mid-May Parks told co-owner Yeazell he had been contacted by the IBEW. Parks testified and the ALJ found that Parks told Yeazell the Union was interested in making Triec a Union shop and that there would be a campaign. However, Yeazell testified that Parks merely told him that he had been contacted and was not interested. Parks also testified and the ALJ found that on a Sunday in late May, Parks told co-owner Heaton that he thought Unionization was a good idea because of the benefits it offered. The ALJ also found that there was a significant discrepancy in co-owners Yeazell's and Jones' testimony regarding the date when the salesman, Holmes, left the company, thus casting serious doubt on Yeazell's credibility. Finally, co-owner Jones testified that employees had been telling him that they were seeing "Mr. Williams, your neighbor," the Union representative, and that Jones understood this to mean that employees were attending Union meetings.
 
 C.
 
 8
 On June 6, Triec introduced a number of new benefits for its employees. Triec contends that these benefits were introduced for three reasons unrelated to the ongoing Union campaign: (1) the loss of two valued employees who left for jobs with better benefits, (2) a dispute between Triec and these two employees over ownership of tools, and (3) co-owner Heaton received negative feedback about the company from Michael Parks. Based on the following facts, however, the ALJ found that Triec introduced these new benefits for the purpose of undermining Union support, in violation of section 8(a)(1).
 
 
 9
 From late April until May 12, Parks and co-owner Heaton worked together on a job in Georgia. During this time Parks spoke to Heaton about the company. While Parks made no complaints about a pension plan, or paid vacations, he did complain about the personalities of other employees and about his own wages. Parks returned to Springfield after completion of the Georgia job, while Heaton went on vacation and did not return to Triec until May 22. Testimony by co-owner Jones indicated that in mid-May, which was before Heaton returned from vacation but at the time Yeazell knew of the organizing effort, co-owners Jones and Yeazell began to discuss policy manual changes. On May 22, after co-owner Heaton returned from vacation, all three owners met and decided upon a new policy manual. The following day, they met with their secretaries to dictate the manual and to prepare a conference schedule to talk with each employee individually. The secretaries suggested paid vacations, and Yeazell said he was going to work on a pension plan.
 
 
 10
 It was in May that two valuable employees left Triec for jobs with better benefits. Co-owner Yeazell testified they left May 21, and when they did, a dispute arose as to the ownership of some tools. Triec contends that this dispute spurred the owners to discuss new benefits on May 22 and to include company provided tools in the new policy manual. However, the ALJ found that on the testimony of co-owner Jones and a payroll clerk, these two employees left Triec during Memorial Day weekend, several days after the owners met to discuss new benefits.
 
 
 11
 Subsequently, on June 5, Parks was in the company offices and saw an envelope from the Union on co-owner Yeazell's desk. The next day, or June 6, the company held a previously unannounced meeting at which all employees in the bargaining unit were present. Based on Yeazell's testimony, Triec asserts that Yeazell did not see the letter from the Union until after the meeting on June 6. However, the ALJ credited Parks' testimony and determined that when Triec received the Union letter demanding recognition and bargaining, Triec decided new benefits were necessary to stave off the Union and held a meeting to announce them.
 
 
 12
 At the June 6 meeting, a new policy manual was presented which was to go into effect on July 1. The policy manual that was to be replaced provided for pay raise evaluations every six months and no other pay increases except those given during the six-month evaluations. It also provided for no paid vacations and for no pension plan coverage except while assigned to a prevailing wage project. It further provided that employees would pay for their own tools although the company would replace broken tools. Although it is disputed whether the company actually followed the semi-annual evaluation policy, the company maintained that it had followed the semi-annual evaluation policy since 1986, conducting evaluations in December and June over company paid lunches and that in most cases raises were given. However, based on testimony of three employees, the ALJ found that Triec did not follow a semi-annual evaluation and pay raise schedule, and that it did not evaluate its employees or provide for raises on any regular basis prior to the introduction of the new policy manual.
 
 
 13
 The new policy manual presented at the meeting on June 6 provided for employee "conferences" every three months to determine pay raises. It also provided for paid vacations and tools at company expense. At the meeting, co-owner Yeazell told the employees that he thought they did not need the Union and that they could work out their problems on a one-on-one basis. A second document was presented setting forth a schedule of employee conferences. Parks testified that in 1989, prior to the June 6 meeting, Yeazell told him that the employees did not work hard enough to deserve a vacation, and this testimony was not contradicted. The ALJ found this statement to be inconsistent with Triec's later desire to give new benefits.
 
 
 14
 Later on June 6, co-owners Yeazell and Jones took Parks to lunch at company expense for his evaluation. The ALJ found in accordance with Parks' testimony that in addition to telling him he was doing a good job, promoting him to a crew leader, and giving him a $1.00 an hour raise, co-owners Yeazell and Jones also told Parks they knew he was involved with the Union and asked if he had signed an authorization card. Neither owner gave Parks any reassurances against reprisals. Triec disputes that the Union was mentioned in this conversation.
 
 
 15
 Employee Tackett was interviewed on June 12. Co-owners Yeazell and Jones informed him he had not worked long enough for a raise but that he would receive another evaluation in three months. Employee Powell was interviewed on June 14 and received a pay raise effective July 1, although he was not yet eligible for a raise based on the number of hours Powell had worked at Triec. Based on these three interviews, the ALJ found that Triec instituted the quarterly wage reviews and gave wage increases to Parks and Powell in order to discourage employee support for the Union in violation of Section 8(a)(1). Additionally, the ALJ found that Triec coercively interrogated Parks, also violating section 8(a)(1).
 
 
 16
 On June 12, Triec held a second meeting of its employees at which co-owner Yeazell asked the employees what it would take to keep the Union out. Employees mentioned higher wages, a good health, welfare, and retirement program, and an apprenticeship program. Yeazell said the company was working on some things including a retirement program. In response to a question by an employee who worked primarily in residential construction, co-owner Heaton said that the residential end of Triec's business would probably be phased out because of increased expenses if the company were unionized, and that Triec would probably lose customers because customers liked dealing with the same electricians. Triec also implemented the new tool policy telling the employees to leave their tools at home. The ALJ found that at this meeting Triec impliedly promised the employees increased benefits and improved terms and conditions of employment in order to discourage support for the Union, thereby violating section 8(a)(1), and that Triec, in violation of section 8(a)(1), threatened the employees with loss of jobs if they chose the Union.
 
 
 17
 On July 7, the Union filed its election petition and on July 21, Triec conducted a third meeting of its employees. The ALJ found that co-owner Yeazell told the employees that Triec did not charge Union wages and if they worked for the Union, they would be laid off six months of the year. Yeazell further stated that the employees' wages "would grow as [they] grew with the company." The ALJ found that this last statement, when considered in the context of the new quarterly wage review system and the recent raises some employees received, constituted a promise of benefits to discourage Union support in violation of section 8(a)(1). Additionally, the ALJ found that Triec threatened the employees with loss of employment in violation of section 8(a)(1).
 
 
 18
 On July 27, employee Powell was approached by co-owner Heaton who told him, "I know that you're one of the most pro-union guys we have at the shop." Heaton asked what were the advantages and disadvantages of the Union, and Powell answered the advantages were wages, health, welfare and pension benefits, and the disadvantages were travel.
 
 
 19
 Powell testified and the ALJ found that on August 1, Heaton approached Powell with a 1961 NLRB decision which purportedly stood for the proposition that an employer did not have to sign a contract with a Union if the Union was voted in. Heaton further told Powell he would like to give him a raise, but all wages were frozen until after the election. Triec denies that Heaton showed Powell an NLRB decision. At no time did Heaton give Powell assurances against reprisals. The ALJ found that Triec coercively interrogated Heaton in violation of section 8(a)(1).
 
 
 20
 On July 28, employee Tackett was asked by co-owner Jones what were the advantages of being a Union contractor and what the Union meant for him. Tackett responded that if he passed the journeyman's test, he would receive a higher wage. Tackett further stated that he was upset because there was a rumor that he was a company informant, and he had mixed emotions about the Union. Jones answered he felt the same way. Jones gave no reassurances to Tackett against reprisals. The ALJ found that Jones coercively interrogated Tackett in violation of section 8(a)(1).
 
 
 21
 On August 9, the day before the election, Triec held its fourth and final meeting of its employees. The three owners were present, and Yeazell stated that company wages and benefits would equal or surpass those of the Union and that he was working on a pension plan. Based on testimony concerning this meeting and earlier testimony, the ALJ found that while Triec had considered a pension plan as early as 1988, it had no serious intention of implementing one, as evidenced by its failure to do so, until Triec learned that the employees considered a pension plan to be an important benefit which the Union offered. The ALJ further found that at the August 9 meeting, Triec made promises of a pension plan and other benefits to discourage Union support in violation of section 8(a)(1). In fact, the ALJ found that even at the time of the unfair labor practice hearing on March 27, 1990, Triec was still suggesting to its employees that it was about to implement a pension plan, a promise devised to discourage Union support. Because of the unfair labor practices committed between July 7, the date of the Union's petition for an election, and the election date, August 10, in which only two of the employees voted for the Union, the ALJ found that Triec interfered with the employees' free choice in the election and set the election aside. The ALJ also found that a majority of employees in the appropriate unit had signed authorization cards, and on that basis, the Union requested recognition; that upon receiving the Union's request, Triec embarked on an unlawful course of conduct which destroyed the Union's majority status; and that a fair re-election could not be held in this case. Based on these findings, the ALJ determined that Triec violated section 8(a)(1) and section 8(a)(5) by failing to recognize and bargain with the Union on and after June 6 and that a bargaining order was warranted. The ALJ then recommended a bargaining order and an order to cease and desist from all future unfair labor practices. The Board subsequently adopted the ALJ's findings and recommendations in their entirety.
 
 II.
 A.
 
 22
 Petitioner NLRB contends that Triec failed to properly preserve for review by this court its exceptions to the ALJ's findings that it (1) unlawfully promised and granted benefits to undermine the Union's support; (2) coercively interrogated employees Tackett, Powell, and Parks; and (3) threatened employees with loss of work and wage increases.
 
 
 23
 Section 10(e) of the NLRA, 29 U.S.C. § 160(e) states:
 
 
 24
 No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.
 
 
 25
 In addition, 29 C.F.R. § 102.46(b)(1)(i) and (ii) of the NLRB's regulations states: "[e]ach exception ... shall set forth specifically the questions of procedure, fact, law, or policy to which exception is taken [and] shall identify that part of the administrative law judge's decision to which any objection is made." Section 102.46(b)(2) states "[a]ny exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to be waived."
 
 
 26
 In its Notice of Exceptions to the ALJ's decision, Triec states in relevant part:
 
 
 27
 Specifically, the Employer excepts to the order to bargain with the Union because such remedy is extraordinary and should be ordered only when the Employer's conduct is so egregious that ordinary remedies are futile. The Judge drew inferences from often conflicting testimony which were unfairly made and were misapplied to the situation at hand.
 
 
 28
 While the last sentence does not state as clearly as is possible its exception to the ALJ's evaluation of the evidence concerning unlawful promises of benefits, coercive interrogation, and threats of reprisal against the employees, we hold that the exception is implied. Furthermore, the Board in its review of the ALJ's decision acknowledged the respondent's exceptions to "certain credibility findings" by the ALJ and wrote, "[w]e have carefully examined the record and find no basis for reversing the finding."
 
 
 29
 The legislative purpose behind section 10(e) was to provide the Board the opportunity to consider, on the merits, the questions to be urged in a review of its order by an appellate court. Marshall Field & Co. v. NLRB, 318 U.S. 253, 256 (1943); Hospital & Serv. Employees Union, Local 399 v. NLRB, 743 F.2d 1417 (9th Cir.1984). In this case, the Board did consider on the merits the issues now brought before this court, thus satisfying the purpose of section 10(e) and thereby preserving those issues for appeal. While petitioner has cited several cases in support of its argument, in those cases, the party whose appeal on a certain issue was waived for failure to timely assert it made no mention whatsoever at the Board level of the issue he then attempted to raise in the appellate court. See, e.g., Detroit Edison Co. v. NLRB, 440 U.S. 301, 311-312 n. 10 (1979); Southern Moldings, Inc. v. NLRB, 728 F.2d 805, 806 (6th Cir.1984); NLRB v. Valley Plaza, Inc., 715 F.2d 237, 240-241 (6th Cir.1983). In this case, however, respondent did raise before the Board, albeit somewhat inexpertly, the issue of substantial evidence to support the ALJ's findings of unfair labor practices. See NLRB v. Blake Constr. Co., Inc., 663 F.2d 272, 283 (D.C.Cir.1981).
 
 B.
 
 30
 The Board's factual findings and its application of the law to the facts is reviewed under the substantial evidence standard. Roadway Express, Inc. v. NLRB, 831 F.2d 1285, 1289 (6th Cir.1987). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision.... If the Board errs in determining the proper legal standards, however, we may refuse enforcement on the grounds that the order has no 'reasonable basis in law.' " Id. (quoting Ford Motor Co. v. NLRB, 441 U.S. 488, 497 (1979)). As the Board is charged with enforcing the National Labor Relations Act, courts must accord deference to the Board's interpretation of the Act, and the Board's interpretation will stand if "reasonably defensible." Ford Motor Co., 441 U.S. at 497.
 
 C.
 
 31
 Section 7 of the NLRA, 29 U.S.C. § 157, guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section ...." An employer who confers benefits or promises to confer benefits upon employees where such conduct might reasonably tend to discourage employees from supporting the Union violates section 8(a)(1). NLRB v. Exchange Parts Co., 375 U.S. 405, 409 (1964).
 
 
 32
 The ALJ found that Triec promised numerous benefits and, in some cases, granted benefits for the specific purpose of undermining Union support, that it coercively interrogated its employees regarding Union sympathies, that it threatened and intimidated its employees, and that it failed to bargain with the Union, all in violation of the NLRA. Triec's primary dispute with this finding lies in the ALJ's decision to credit the employee's testimony over that of the Triec owners' testimony. However, an ALJ's credibility determinations will be upheld if they are "reasonable." NLRB v. Garon, 738 F.2d 140, 142 (6th Cir.1984). Furthermore, "[t]he credibility determinations made by the [ALJ] and adopted by the Board are entitled to great weight." Carrier Corp. v. NLRB, 768 F.2d 778, 782 (6th Cir.1985) (quoting Kusan Mfg. Co. v. NLRB, 749 F.2d 362, 366 (6th Cir.1984)). Moreover, the ALJ and Board can choose to credit some parts of a witness' testimony but not other parts of the witness' testimony. Carrier Corp., 768 F.2d at 782. Based on our review of the record, we conclude that it was not unreasonable for the ALJ to credit the employees' testimony in determining that Triec committed numerous unfair labor practices and unlawfully refused to bargain.
 
 
 33
 Substantial evidence on the record as a whole exists to show that Triec knew of a Union campaign before it decided to implement new benefits. It is undisputed that Parks informed co-owner Yeazell in mid-May that a Union representative had contacted him and that there was going to be a campaign. Triec contends that this conversation is not enough to establish Triec's knowledge of a "serious" Union campaign prior to its decision to implement a new policy manual. Triec cites no cases for this proposition. Based on this conversation, it was reasonable for the ALJ to determine that Triec did indeed have knowledge of a Union campaign before May 22.
 
 
 34
 An employer violates section 8(a)(1) where it coercively interrogates employees regarding their Union sympathies. Garon, 738 F.2d at 143. An interrogation is coercive if, when viewed in all the surrounding circumstances, "its probable effect" tends to interfere with employees' free exercise of their section 7 rights. Larand Leisurelies, Inc. v. NLRB, 523 F.2d 814, 819 (6th Cir.1975). Furthermore, an interrogation must be viewed as the employee would have interpreted it, having in mind the total conduct of the employer. Jervis Corp. v. NLRB, 387 F.2d 107, 111 (6th Cir.1967).
 
 
 35
 Based on the facts stated earlier, there is substantial evidence in the record as a whole to support the ALJ's findings that Triec unlawfully and coercively interrogated employees Parks, Powell, and Tackett.
 
 
 36
 A company which unlawfully threatens and intimidates employees regarding the effects of unionization also violates section 8(a)(1). A prediction by an employer regarding the precise effects which the employer believes Unionization will have on the company may be considered threats against the employees unless based on available objective facts. NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 618 (1969); Indiana Cal-Pro, Inc. v. NLRB, 863 F.2d 1292, 1298 (6th Cir.1988). Furthermore, "[i]n reviewing Company statements made in the emotion of a union drive, the Board [may] reasonably [consider] the effect of the remarks from the point of view of those whose livelihood may depend on them." Indiana Cal-Pro, Inc., 863 F.2d at 1299.
 
 
 37
 In meetings during June, July, and August, the company predicted layoffs up to six months a year, loss of jobs due to strikes, the phasing out of the residential end of the business implying loss of more jobs, loss of customers, and lower and decreasing wages if the employees voted in the Union. Triec offered no objective, factual basis to support these predictions. Instead, standing in the employees' shoes, these "predictions" rise above mere campaign rhetoric, as Triec contends, to constitute direct threats of loss of employment if the employees voted for the Union.
 
 D.
 
 38
 Finally, Triec contends the Board's bargaining order is an inappropriate remedy in this case. A bargaining order is an appropriate remedy where (1) a Union has received a valid authorization card majority and requested bargaining on that basis, (2) an employer has embarked on a series of unfair labor practices dissipating the Union's majority, and (3) a fair re-election cannot be had under all the circumstances. M.P.C. Plating, Inc. v. NLRB, 912 F.2d 883, 888 (6th Cir.1990); Indiana Cal-Pro, Inc., 863 F.2d at 1300; see also Gissel, 395 U.S. at 613-615; NLRB v. C.J.R. Transfer, Inc., 936 F.2d 279, 282-283 (6th Cir.1991). In meeting the three stated requirements, the Board must establish a causal connection between the unfair labor practices and the resulting inability to hold a fair re-election. Indiana Cal-Pro, Inc., 863 F.2d at 1301; M.P.C. Plating, Inc., 912 F.2d at 888. The ability to hold a fair re-election often depends on the extent to which the inhibiting effects of the unfair labor practices linger on, thus preventing a fair re-election. See, e.g., Exchange Bank v. NLRB, 732 F.2d 60, 62 (6th Cir.1984); NLRB v. Quality Aluminum Prods., Inc., 813 F.2d 795, 796 (6th Cir.), cert. denied, 484 U.S. 825 (1987); M.P.C. Plating, Inc., 912 F.2d at 883.
 
 
 39
 Triec contends that this case fails to satisfy the third element necessary for an appropriate bargaining order; viz., a fair re-election cannot be had under all the circumstances. In NLRB v. Fredrick's Foodland, Inc., 655 F.2d 88, 90 (6th Cir.1981), this court held that despite numerous unfair labor practices undermining a valid Union majority thereby causing the Union's loss of an election, a bargaining order was inappropriate because a fair re-election was possible. As petitioner admits (Petitioner's Brief at 40), the unfair labor practices committed in Foodland are "essentially indistinguishable" from those in this case.
 
 
 40
 In Foodland, employees met at the home of another employee to organize a Union campaign. One month later, twenty-six employees in the bargaining unit of forty-nine employees signed valid authorization cards. Three weeks later, an election was held and the Union lost, twenty-eight to eighteen with two challenged ballots. The Union then filed numerous unfair labor practice charges against the company which the Board determined to be meritorious. Those unfair labor practices committed by Foodland, and in violation of section 8(a)(1) included: "coercive interrogations of employees, solicitations of grievances from employees, creating the impression of surveillance of Union activities, communicating to employees that their support of the Union would be futile, promising benefits to employees to discourage support of a Union, and granting an across-the-board wage increase shortly before the election in order to induce the employees to vote against the Union." 655 F.2d at 90. The Board in Foodland further determined that Foodland violated section 8(a)(5) by failing to bargain with the Union and ordered it to bargain collectively with the Union.
 
 
 41
 In determining not to enforce the bargaining order against Foodland, this court considered three factors. First, approximately two months after the election, Foodland opened a second store increasing the number of its employees to roughly eighty-five. Although it is unclear from the opinion how many of these new employees were actually eligible to be included in the bargaining unit, the Board considered "the large increase in the number of employees in the unit due to the reopening of the second store" an important factor in determining not to enforce the bargaining order. Second, approximately three and one-half years elapsed from the time of the election and its review by this court. Third, the nature of the unfair labor practices were deemed not so pervasive and outrageous as to warrant a bargaining order in the context of that particular case. 655 F.2d at 90.
 
 
 42
 In the present case, Triec contends that since the election, the bargaining unit has increased from eleven employees to thirteen with only six of these employees having participated in the past election. On this basis, and on the fact that two years have elapsed since the election, and considering the nature of the unfair labor practices, Triec argues Foodland is controlling and this court should not enforce petitioner's bargaining order.
 
 
 43
 On the other hand, petitioner contends that this case is dissimilar from Foodland in that the bargaining unit at Triec has remained stable at approximately eleven employees, more than half of whom were subjected to Triec's wide range of unfair labor practices. In addition, petitioner notes approximately two years have elapsed in this case, compared to three and one-half years in Foodland, between the time of the Union election and review by this court. Finally, and most importantly, petitioner observes that Triec's unlawful conduct, unlike that in Foodland, extended beyond the election to the eve of the unfair labor practice hearing before the ALJ on March 27, 1990. At that time, Triec continued to make promises of a pension plan to undermine Union support. In short, the same Triec owners who committed a series of unfair labor practices successfully discouraging Union support two years ago continued to use similar tactics as recently as a little over one year ago. Thus, Triec's conduct following the election reveals a continuing hostility toward the Union.
 
 
 44
 As in Foodland, we must look at the unfair labor practices committed in the context of the present case. Unfair labor practices committed in one set of circumstances may have a greater (or lesser) impact on the ability to hold a subsequent fair election than the same unfair labor practices in an entirely different set of circumstances. The issue before us is not how egregious the unfair labor practices were when viewed in isolation, but, rather, whether the unfair labor practices committed under the circumstances of this case render the possibility of a subsequent fair election to be slight. See Gissel, 395 U.S. at 614; NLRB v. C.J.R. Transfer, Inc., 936 F.2d 279, 283 (6th Cir.1991); Foodland, 655 F.2d at 90.
 
 
 45
 There are three important factors which distinguish the present case from Foodland. First, because the bargaining unit at Triec is so much smaller in size than in Foodland, it is not unreasonable to determine that the unfair labor practices would have a longer lasting effect in this case than in Foodland, regardless of whether the bargaining unit is comprised of eleven or thirteen employees. Six Triec employees have personally experienced the unlawful conduct committed by Triec and could easily communicate their knowledge to such a small group. This court has considered a small bargaining unit size in deciding to enforce a bargaining order. Indiana Cal-Pro, Inc., 863 F.2d at 1301. Second, approximately two years have passed since the election in this case compared to three and a half in Foodland, thus memories of Triec's unlawful conduct has had less time to grow stale. Third, Triec has continued to unlawfully discourage Union support as recently as one year ago. Triec's conduct could serve to expose new employees to Triec's unlawful conduct. Moreover, its recent unlawful activity raises the question of Triec's intentions as to its behavior in any future election. "In fashioning a remedy in the exercise of its discretion, ... the Board can properly take into consideration the extensiveness of an employer's unfair practice ... and the likelihood of their reoccurrence in the future." Gissel, 395 U.S. at 614. Additionally, the fact that this unlawful activity was carried out by the highest level of officials in Triec, a small company, also creates an effect of long lasting duration.
 
 
 46
 While we recognize that the usual deference to Board findings is not as great when the Board orders the less preferred remedy of a bargaining order without the necessity of holding an election, see NLRB v. Valley Plaza, Inc., 715 F.2d 237, 244 (6th Cir.1983), we view the unlawful conduct on the part of Triec as flagrant and extreme, and, therefore, sufficiently egregious to warrant a bargaining order under the circumstances involved in this case. In our view the chance of a fair election would be, at best, slight. Gissel, 395 U.S. at 614.
 
 III.
 
 47
 Accordingly, as we conclude that substantial evidence exists in the record to support each element of the Board's order, enforcement of the Board's order is GRANTED.
 
 
 48
 SUHRHEINRICH, Circuit Judge, dissenting.
 
 
 49
 I agree in all respects with the majority except for Part D of the opinion affirming the bargaining order. As the unfair labor practices in this matter are "essentially indistinguishable" from NLRB v. Fredrick's Foodland, Inc., 655 F.2d 88 (6th Cir.1981), I would not affirm the order. To do otherwise, it seems to me, places a greater burden on small closely-held companies than that placed on large corporations.
 
 
 
 [1]
 All dates refer to 1989 unless otherwise specified