**TORBITT & CASTLEMAN, INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 96–5658, 96–5734.

United States Court of Appeals, Sixth Circuit.

Argued June 13, 1997.

Decided Aug. 19, 1997.

James D. Cockrum (argued), D. Patton Pelfrey (briefed), Brown, Todd & Heyburn, Louisville, KY, for Petitioner/Cross–Respondent.

Joan E. Hoyte (argued and briefed), National Labor Relations Board, Peter Winkler (briefed), National Labor Relations Board, Appelate Court Branch, Aileen A. Armstrong, Deputy Associate General Counsel, Washington, DC, for Respondent/Cross–Petitioner.

Before: KRUPANSKY, NELSON, and BOGGS, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

In this unfair labor practices case, Torbitt & Castleman, Inc. ("Torbitt") petitions this court for review of the National Labor Relations Board's order, finding that Torbitt had committed unfair labor practices during the critical period before an election. The NLRB seeks enforcement of its February 29, 1996, order. For the reasons discussed below, we grant the NLRB's petition for enforcement in part and grant Torbitt's petition for review in part.

## I

At its facility in Buckner, Kentucky, Torbitt produces jellies, jams, sauces, and other condiments, and manufactures its own plastic bottles for those products. Torbitt's operation is organized into several departments, including jelly, syrup, blow molding, and shipping and receiving. It employs 170 employees, of which approximately 120 are hourly production and maintenance employees; the remaining 50 are office staff.

The majority of the production and maintenance employees work on one of two shifts, starting at 6:00 a.m. and 2:30 p.m. A third shift of employees work mostly in the blow molding department, which operates 24

hours a day. The company's office hours are generally 8:00 a.m. to 4:00 or 5:00 p.m.

Torbitt's 1993 fiscal year was the worst in its history, due to events such as losing its largest jelly account and the closing of one of its peanut butter accounts. As a result, the company began assessing its operations and hired a consultant, William M. Mercer, Inc. ("Mercer") to assist in analyzing the company's problems. Torbitt also instituted a wage freeze.

In May 1994, Mercer prepared recommendations, which it gave to Torbitt's president, Steven McDonald, for presentation to Torbitt's board of directors. Mercer's recommendations focused on improving the company's competitive position in the market by creating, attracting, and retaining a more effective workforce through a new and different wage structure, a shift differential, new job bidding procedures, and a "gainsharing" program. The overall concept recommended by Mercer was to create an environment of cooperation and empowerment among employees. In June 1994, the board of directors approved Mercer's recommendations and these plans and concepts were announced to the company's employees in meetings conducted by McDonald in late June.

After the board of directors approved Mercer's recommendations, General Drivers, Warehousemen and Helpers Local Union No. 89 ("the union"), which is affiliated with the International Brotherhood of Teamsters, AFL–CIO, began an organizational drive among Torbitt production and maintenance employees. The company learned of the drive by August 9 and began an anti-union campaign, including distributing anti-union literature to the employees and having McDonald and Torbitt's chief operating officer, Mike Upchurch, conduct a series of anti-union employee meetings. Around October 1, Barbara Wry, an independent consultant who had been hired by Torbitt to implement the gainsharing program, began participating in these meetings.

A. *Implementation of suggestion boxes*

During these meetings, Wry and Upchurch explained the details of the gainsharing program, which called for "improvements in productivity," reduction in the cost of operations, and the sharing of all "gains" realized between the company and its employees. Wry and Upchurch also discussed the formation of certain committees and requested that employees volunteer to serve on those committees. Several employees volunteered and, from those employees, the company randomly selected members for the "improvement team," which also had one supervisor on it. On October 18, 1994, the Company posted the following memorandum from the improvement team:

> The Improvement Team has been meeting to discuss methods of identifying problems at T & C, and implementing successful solutions that will hopefully improve our operations' efficiency, safety and overall quality of life. We need your help in attacking these issues! We need to know from each and everyone [sic] of you, what *you* think our major problem[s] are and how they can be effectively solved.
>
> Suggestion boxes will be installed later this week in all key areas. We hope to have them in place on Wednesday. Forms will be provided for your convenience. Additionally, we are seeking volunteers to meet with us and help brainstorm these issues. If you are interested, please let your supervisor know, so that we can schedule several people into our upcoming meetings. Please do this by Tuesday, October 25.

The next day, October 19, Torbitt informed the employees that the purpose of the suggestion boxes was to gather ideas for "productivity and quality of life improvements" and stated that the employees should feel free to put their ideas into writing. Torbitt then installed three suggestion boxes, with suggestion forms, near the employee time clocks throughout the facility. The suggestion forms next to the boxes asked employees to identify problems related to safety, production, efficiency, cost reduction, and quality of life; to suggest possible solutions; and to estimate the impact of any related improvements.

Employees quickly started submitting suggestions on a wide variety of topics, including improving health, sanitation, and safety conditions; providing a better cross-training

program and a better health insurance plan; instituting a better disciplinary procedure; reducing absenteeism; reducing the number of overtime hours employees were required to work; assigning employees to shifts depending on production demand; improving policies related to hiring and promoting temporary employees; rotating employee lunch hours; implementing paid sick days; and providing outdoor shelter for smokers.

The improvement team rated each suggestion in terms of urgency, the action called for, and the potential difficulty of implementing the suggestion. Torbitt then took action with respect to a number of the employee suggestions. For example, in response to a complaint that the employees worked too many overtime hours, Torbitt implemented an additional shift. In response to another employee complaint that the dumpster area was crowded and hazardous because of the number of employees taking out trash, Torbitt contracted for the installation of a hydraulic lift. Torbitt also repaired broken toilets, towel dispensers, and a water fountain; established a fire safety program; agreed to plow and remove snow and ice from the parking lots; instituted a cross-training program; and constructed two outdoor shelters to accommodate smokers.

### B. Changes in the parking lot policy

Torbitt also implemented changes in its parking policy. Torbitt's facility has two parking lots. Lot A is closer to the entrance of the facility and has approximately 70 parking spaces. Lot B has approximately 150 spaces. Under the old policy, Torbitt prohibited production and maintenance employees from parking their vehicles in Lot A during office hours because that lot was reserved for managers, supervisors, and office staff. Torbitt only permitted production and maintenance employees to park in Lot A after office hours and on weekends. The production and maintenance employees disliked Torbitt's parking policy and they complained among themselves about the longer walk from Lot B, especially during bad weather. On October 13, 1994, Torbitt posted a memorandum announcing that both parking lots were now open to all employees on a first come basis.

### C. Threat against employee Timothy Hornback

On November 10th, the union filed an unfair labor practice charge, alleging that Torbitt had made threats of retaliation against union activity to employees, including Timothy Hornback. This charge alleged:

[Torbitt] has held meetings and given speeches, made threats to employees, inferring the Union would cause the Company to go out of business, or employees would receive less as far as wages, benefits, working conditions, etc., and by other acts and conduct has interfered with, restrained and coerced Tim Hornback, Glenn Brown, and Robert Lay in the exercise of their rights guaranteed in Section 7 of the Act.

The union filed another unfair labor practice charge, in which Hornback was also named, on November 14, 1994. That charge alleged among other things, that Torbitt had "contributed financial and other support by promising employees [including] Tim Hornback.. 'Bonus Money.'" Although these charges were ultimately withdrawn, they form the basis of the charge that Torbitt threatened Hornback with reprisals for his union activity.

On November 23, after lunch, Hornback and employee George Reese were at their posts on opposite sides of a case-packer conveyor belt. The production manager, Nelson Mayse, approached Hornback and told him, "We have the Gains Sharing Committee, the Improvements Team Committee, we have the Placing Team Committee, and we have the Hatchet Committee." Hornback asked him what the "hatchet committee" was. In response, Mayse raised his hand and said, "I didn't say that. I didn't say that." Mayse then walked away. Torbitt maintains that this exchange never occurred, and in fact never could have occurred, since Mayse did not learn of the charges involving Hornback until after the threat had allegedly occurred.

On December 2, 1994, a secret-ballot election was conducted. Of the approximately 120 eligible voters, 47 cast ballots in favor of representation and 64 against, with 5 challenged ballots. The union then filed objections, contending that Torbitt had engaged in

conduct that interfered with the election outcome. It also filed unfair labor practice charges against Torbitt.

The Board, agreeing with the ALJ, found that Torbitt had violated § 8(a)(1) of the National Labor Relations Act ("NLRA") by announcing and implementing a new parking policy favorable to employees, by soliciting employee grievances and impliedly promising to correct them, and by threatening Hornback with unspecified reprisals because of his union activities. The Board's order requires Torbitt (1) to cease and desist from granting benefits to the employees and from impliedly promising to correct employee grievances in order to thwart union organization; (2) from threatening employees with reprisals for being involved in union activities; and (3) from interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by § 7 of the NLRA. The Board also ordered Torbitt to post a remedial notice.

## II

Torbitt argues that the NLRB order should not be upheld because (1) Mayse's alleged statements do not constitute a threat and the Board based its finding that Mayse threatened Hornback "solely on conjecture and speculation contrary to the evidence"; (2) the Board improperly refused to draw an adverse inference from the General Counsel's failure to call Reese as a witness to the alleged threat; (3) the implementation of suggestion boxes did not constitute solicitation of grievances and is protected by the legitimate business justification of Torbitt's gainsharing program; (4) the change in the parking lot policy does not constitute a benefit; and (5) the parking lot policy was justified by the gainsharing program. We address the issues in the order presented.

■ Initially, we note that § 7 of the NLRA, 29 U.S.C. § 157, guarantees employees "the right to self-organization, to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 8(a)(1), 29 U.S.C. § 158(a)(1), makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise" of their § 7 rights:

The broad purpose of § 8(a)(1) is to establish "the right of employees to organize for mutual aid without employer interference".... [I]t prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect.

*NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964) (citations omitted).

■ Our review of the Board's decision is quite limited. The NLRB's factual determinations are conclusive if, upon the entire record, they are supported by substantial evidence. *NLRB v. Fluor Daniel, Inc.*, 102 F.3d 818, 836 (6th Cir.1996). Application of the substantial-evidence standard of review requires this court to consider the body of evidence opposing the NLRB's decision, but prohibits us from conducting a de novo review of the record, and we are foreclosed from setting aside the agency's findings of fact if its findings are supported by substantial evidence even though this court may have reached a different conclusion had we originally decided the issue. *NLRB v. Garon*, 738 F.2d 140, 141 (6th Cir.1984). The assignment of credibility to witnesses is the prerogative of the Board. *Ibid.* Where there is a conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility and this court ordinarily will not reverse credibility evaluations of the Board or ALJ, who has observed the witnesses' demeanor." *NLRB v. Aquatech, Inc.*, 926 F.2d 538, 544 (6th Cir.1991) (internal quotation omitted). Additionally, the Board's application of the law to the facts is reviewed under the substantial-evidence standard and the Board's reasonable inferences drawn from those facts may not be displaced upon review. *NLRB v. United States Postal Serv.*, 841 F.2d 141, 144 (6th Cir.1988).

## III

Initially, Torbitt argues that the testimony of Mayse and Upchurch shows that Mayse could not have unlawfully threatened Horn-

back on November 23 rd because Mayse was not yet aware of the charges naming Hornback when the alleged incident occurred. It claims that Mayse only learned of the charges on November 28 th, when he was informed of them by Upchurch. Moreover, Torbitt argues that even if Hornback's testimony regarding Mayse's statements were believed, the testimony is insufficient to establish a violation of the NLRA: "Mayse's alleged comments about the existence of a 'hatchet committee' is so vague and ambiguous that it cannot be reasonably stated to be a threat. In fact, it was so innocuous that Hornback testified he never reported it or sought any other explanation about it." Torbitt's Brief at 23. Furthermore, Torbitt argues, Hornback could not have perceived these comments as retaliatory because no testimony or other evidence exists to show that Hornback knew of the charges involving him. These arguments lack merit.

■■■ An employer violates § 8(a)(1) of the NLRA by threatening employees with reprisals. *NLRB v. E.I. DuPont De Nemours,* 750 F.2d 524, 528 (6th Cir.1984). "In determining whether a statement is a coercive threat, the Board considers the 'total context' of the situation and 'is justified in determining the question ... from the standpoint of employees over whom the employer has a measure of economic power.'" *Ibid.* (citation omitted). It is unnecessary to show that any employee was in fact intimidated or coerced by the statements made. *NLRB v. Electric Steam Radiator Corp.,* 321 F.2d 733, 736 (6th Cir.1963). The Board does not consider subjective reactions. *Sunnyside Home Care Project, Inc.,* 308 N.L.R.B. 346, 346 n. 1 (1992). Rather, the test is whether the statement has a "tendency to coerce." *NLRB v. Okun Bros. Shoe Store, Inc.,* 825 F.2d 102, 107 (6th Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988). The Board may take into account the "economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing*

*Co.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). Moreover, "[i]f the inference or conclusion found by the Board that the statements constitute a threat is a reasonable one, its findings will not be set aside on review even though a different inference or conclusion may seem more plausible." *Henry I. Siegel Co. v. NLRB,* 417 F.2d 1206, 1214 (6th Cir.1969), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2175, 26 L.Ed.2d 545 (1970).

■■■ Although Torbitt argues that the "record is totally void of evidence that Mayse knew of the unfair labor practice," the ALJ's finding that Mayse had knowledge of the charges is reasonable and supported by the evidence. Additionally, the ALJ's credibility determinations are reasonable in light of the record.[1] In finding Hornback's testimony credible, the ALJ noted that Hornback "testified in a forthright manner and was consistent concerning what Mayse said to him." Additionally, he noted that Hornback had no apparent motive for fabricating the statement attributed to Mayse, and that, if Hornback had wanted to falsely accuse Mayse of making threats, it was unlikely that he would have chosen language that was not an obvious threat. He also found that Mayse had a motive to lie "to evade responsibility for having made an unlawful threat to an employee." While another judge may have accorded more weight to Mayse's testimony, the simple fact that the ALJ credited Hornback's version of the event over Mayse's denial is no basis for questioning the credibility determination. The evidence showed that copies of the charges arrived at Torbitt prior to the 28 th. It was therefore reasonable for the ALJ to conclude, given the small size of the firm, that word of the charges "might easily have been spread by employees" and would have reached Mayse.

The ALJ also reasonably found that Hornback's account was not undermined by the testimony of Upchurch. Even assuming that Upchurch did not receive copies of the charges prior to November 28 th, it does not necessarily follow that Mayse did not learn of

---

1. The ALJ discredited Mayse's denial of the threat and his testimony relating to when he first learned of the union's charges, as well as Up-church's testimony relating to Mayse's knowledge of the charges, crediting instead Hornback's testimony.

the charges before that date, as the testimony clearly indicates that Upchurch was not the first Torbitt employee to learn of the charges.

There is also no merit to Torbitt's contention that Hornback was not coerced or intimidated by Mayse's "hatchet committee" statement. The ALJ could reasonably conclude that such a statement had a tendency to coerce, especially given the timing of the statement—several weeks after the charges were filed—as well as the lack of any other explanation for why such a statement was made. Moreover, even were Torbitt's argument accepted, the conclusion that the ALJ's determination was in error does not necessarily follow since an employee's subjective reaction does not render the threat lawful or unlawful. The test is not whether the employee "was in fact intimidated or coerced." *Electric Steam Radiator Corp.*, 321 F.2d at 736.

### IV

■ Next, Torbitt argues that the Board erred in failing to draw an adverse inference from the General Counsel's failure to call Reese as a witness since he allegedly heard the exchange between Mayse and Hornback. This argument is also without merit.

■ Although the Board allows an adverse inference to be drawn regarding any factual question to which a witness is likely to have knowledge when a party fails to call that witness if he "may reasonably be assumed to be favorably disposed to the party," no such adverse inference is warranted "when both parties could have confidence in an available witness' objectivity." *International Automated Machs., Inc.*, 285 N.L.R.B. 1122, 1123 (1987), *enforced*, 861 F.2d 720 (6th Cir.1988). In this case, the Board was not required to draw such an adverse inference. Unlike *International Automated Machines*, Reese, an employee, could not reasonably be expected to favor one party over the other. Moreover, Torbitt fails to recognize in its argument that *International Automated Machines* does not require that an adverse inference be drawn, rather an "adverse inference *may be drawn*." *Ibid.* (emphasis added). Simply because the Board chose not to draw the adverse inference in this instance

does not require this court to disturb that decision.

### V

■ Torbitt argues next that the implementation of the suggestion boxes did not constitute solicitation of grievances and that it had met its burden by rebutting any presumption by showing "a legitimate business justification for the existence and timing of its conduct." Torbitt's Brief at 32. We agree.

■ Grievance solicitation during the pre-election period is not a per se violation of § 8(a)(1) of the Act, but it is an unfair labor practice to solicit employee grievances where the solicitation is accompanied by the employer's express or implied suggestion that the grievance will be resolved or acted upon only if the employees reject union representation. *NLRB v. Arrow Molded Plastics, Inc.*, 653 F.2d 280, 283 (6th Cir.1981). "[I]t is not the solicitation of grievance itself that is coercive and violative of Section 8(a)(1), but the promise to correct grievances or a concurrent interrogation or polling about union sympathies that is unlawful; the solicitation of grievances merely raises an inference that the employer is making such a promise, which inference is rebuttable by the employer." *Gull, Inc.*, 279 N.L.R.B. 931, 946 (1986). An employer may rebut such a preliminary finding by showing a legitimate business justification for the challenged practice. *See NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967).

In this case, we believe that the implementation of the suggestion boxes was an integral part of the gainsharing program that Torbitt had already begun to implement before the unionization drive began. And while we are aware that our review of the Board's decision is quite limited, we are convinced that the Board erred in finding that the use of suggestion boxes in this instance constituted an unfair labor practice. This is not a situation where the employer decided to begin soliciting grievances in order to hold at bay a union that was knocking at the door. Rather, this is a situation where an employer is seeking to implement a program that is

directly related to improving productivity, something it needed to do to remain fiscally sound.

It is undisputed that Torbitt had decided to go ahead with the gainsharing program, which the Board had found to be completely legal, prior to the union campaign. And the evidence shows that some form of solicitation of employees' opinions was included in Wry's recommendations for a gainsharing plan. Thus, unlike most cases where we have found an unfair labor practice through the solicitation of grievances during the critical period, see e.g., *Arrow Molded*, 653 F.2d at 283, Torbitt had established an intent to solicit ideas from employees before the commencement of union activity. And the manner in which the solicitation of these opinions was implemented—through the installation of suggestion boxes—does not alter the fact that employee input was an important part of the gainsharing program.

■ A review of the suggestion forms and the summaries of action taken on suggestions also shows that the purpose of the suggestion boxes was not to solicit grievances with the implied or express intent that the grievances would be remedied should the employees reject the union. Rather, the purpose was to improve Torbitt's efficiency. And contrary to the Board's position, we do not believe that Torbitt violated the NLRA by not affirmatively limiting its solicitation of employee suggestions to methods of improving productivity. Although many of the suggestions dealt with "quality of life issues," even such issues were directly in line with Torbitt's plans to create, attract, and retain a more effective workforce as well as to create an environment of cooperation and empowerment among employees. Moreover, an employer is not required to state affirmatively that it will ignore all suggestions that would make the workers happy. As the old adage goes, a happy employee is a productive employee. Certainly, an employer need not forego all attention to employee ideas simply because an organization campaign is underway, especially where, as here, the employer intended all along to seek employee input.

## VI

■ Finally, Torbitt argues that its change in the parking lot policy did not constitute a benefit. We disagree.

■ Section 8 "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *Exchange Parts*, 375 U.S. at 409, 84 S.Ct. at 459.

> The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.

*Ibid.*

■ To determine whether granting the benefit would tend unlawfully to influence the outcome of the election, the Board examines a number of factors, including (1) the size of the benefit conferred in relation to the stated purpose for granting it; (2) the number of employees receiving it; (3) how employees reasonably would view the purpose of the benefit; and (4) the timing of the benefit. *B & D Plastics, Inc.*, 302 N.L.R.B. 245, 245 (1991). Additionally, even a small benefit during the critical period may be actionable. *See, e.g., Yale New Haven Hospital*, 309 N.L.R.B. 363 (1992). When the grant of benefits closely follows the employer's first learning of the employees' interest in unionization, it is reasonable to draw an inference of improper motivation and find interference with the employee freedom of choice, absent an affirmative showing of a legitimate business reason for the timing. *NLRB v. American Spring Bed Mfg.*, 670 F.2d 1236, 1243 (1st Cir.1982).

In this case, although the benefit appears relatively small, it was something that had bothered many of the production and maintenance employees, the same employees seeking union representation. Thus, given the timing of the change in parking policy—less than one month after Torbitt had learned of

the union activity—we find no error in the Board's conclusion. And Torbitt's contention that the policy change affected very few people is unpersuasive since those employees directly affected by it are the ones receiving the benefit.[2]

Torbitt also argues that its prior adoption, implementation, and announcement to its employees of its gainsharing program "serves as the necessary legitimate business justification in support of both the existence and timing of Torbitt's implementation of its parking lot policy." Torbitt's Brief at 34–35. Again, we disagree.

First, there is no mention of any planned change in parking policy at Torbitt's facility in any of the communications from Wry in which she outlined the elements of the gainsharing program. There is also no suggestion of any change in the parking policy in either Wry's situation assessment or in her three-phase action plan for implementing a gainsharing program, and there were no references made to any particular parking policy in either the gainsharing time line Wry created or in the documents she relied on when formulating the gainsharing program.

Second, the evidence shows that the decision to change its parking policy was not made until September 22 or 23, 1994—one or two days after the union had filed its election petition. And McDonald testified that the change in parking policy was his idea and that Wry merely agreed that the idea would be compatible with a gainsharing program. Wry similarly testified that she, Upchurch, and McDonald all agreed during the September meeting that the change in parking policy would be a good symbolic gesture illustrating a new equality of employees under the gainsharing plan. This evidence supports the Board's finding that the change in parking policy was not an integral part of the gainsharing plan and that it was likely adopted in response to the union's filing an election petition, especially given the timing of the new policy and the employees most benefitted by it.

2. Torbitt employs 170 employees, 120 of whom are hourly production and maintenance employees; the remaining 50 are office employees. The

## VII

For the foregoing reasons, we **GRANT IN PART and DENY IN PART** the NLRB's petition for enforcement and **GRANT IN PART and DENY IN PART** Torbitt's petition for review.

70 spaces were almost completely taken up by the 50 office employees.