NATIONAL LABOR RELATIONS
BOARD, Petitioner/Cross–
Respondent,

Local 550–M Graphic Communications
International Union, AFL–CIO,
Intervenor,

v.

DICKINSON PRESS, INC.,
Respondent/Cross–
Petitioner.

Nos. 97–5626, 97–5673.

United States Court of Appeals,
Sixth Circuit.

Argued April 29, 1998.

Decided June 9, 1998.*

Ordered Published Aug. 5, 1998.

* This decision was originally issued as an "unpublished decision" filed on June 9, 1998. On July 17, 1998, the court designated the opinion as one recommended for full-text publication.

Fred L. Cornnell, Jr. (briefed), National Labor Relations Board, Office of the General Counsel, Washington, DC, Aileen A. Armstrong, Deputy Associate General Counsel (briefed), John D. Burgoyne, Acting Deputy Associate General Counsel, Ana Avendano (argued and briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Petitioner/Cross–Respondent.

Thomas D. Allison, Allison, Slutsky & Kennedy, Chicago, IL, for Intervenor.

David E. Khorey (argued and briefed), Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Respondent/Cross–Petitioner.

Before: KENNEDY, CONTIE, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

The National Labor Relations Board (the "Board") seeks enforcement of its order to bargain against Dickinson Press, Inc. ("Dickinson"), which has cross-petitioned for review of that order. In February of 1996, Dickinson's employees re-elected Local 550–M Graphics Communications International Union, AFL–CIO (the "Union") as its collective bargaining representative. Dickinson raises numerous objections to that election based on alleged misconduct by the Union, its representatives, and a third party. Because substantial evidence supports the Board's conclusion that the incidents of misconduct did not interfere with the employees' free and uncoerced choice of union representation, we will enforce the Board's order.

## I

Dickinson is engaged in the commercial printing of bibles and other religious books, as well as some children's materials. The Union was first certified as the employees' collective bargaining representative in September of 1994. Following an employee petition to decertify the Union, a decertification election was held on October 18, 1995. Twenty-three employees voted against the Union, twenty-one employees voted in favor of the Union, with two challenged ballots. On February 6, 1996, however, the Board ordered a second election after sustaining the Union's sole objection, which alleged that Dickinson had improperly promised employees a wage increase if the Union lost the October 18, 1995 election. Supp. J.A. at 8–11. A second decertification election was held on February 28, 1996, at which time twenty-four employees voted for the Union, with twenty votes against and three challenged ballots.

Dickinson filed nine objections to the February decertification election. After conducting a hearing on seven of the objections, the hearing officer recommended that all seven objections be overruled and that the Board certify the Union as the employees' exclusive bargaining representative. J.A. at 23–30. On November 8, 1996, the Board adopted the hearing officer's recommendations. J.A. at 83–85. After the company refused to recognize and bargain with the Union, the Board found Dickinson in violation of §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5), and on March 14, 1997 ordered Dickinson to bargain with the Union. Supp. J.A. at 2. Dickinson refused to obey the Board's order, and the Board sought enforcement of its order; Dickinson filed a petition for review of the Board's order.

## II

Although the Board strives to maintain "laboratory conditions" during representation elections, such conditions are rare, "and elections are not automatically voided whenever they fall short of perfection." *NLRB v. Duriron Co.*, 978 F.2d 254, 256 (6th Cir.1992). Rather, the Board has broad discretion in determining whether election conditions allowed for the fair and free choice of bargaining representatives by employees. *See id.* at 256–57. The courts must respect the Board's legal interpretations if reasonable. *See Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398–99, 116 S.Ct.

1396, 134 L.Ed.2d 593 (1996); *see also NLRB v. Americare–New Lexington Health Care Ctr.*, 124 F.3d 753, 756 (6th Cir.1997); *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998). The Board's findings with respect to whether an election reflected "the fair and free choice" of the employees "will not be disturbed on appeal where there is substantial evidence in the record as a whole to support its conclusions." *Mitchellace, Inc. v. NLRB,* 90 F.3d 1150, 1155 (6th Cir.1996); *see also Kux Mfg. Co. v. NLRB,* 890 F.2d 804, 808 (6th Cir.1989). The party seeking to overturn an election bears the burden of showing "not only that unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *Kux,* 890 F.2d at 808 (quotation omitted).

## A

 Dickinson alleges that Cherry Vassar, the chief union steward and thus a Union agent, purchased a winter jacket and other items of value for employee Jim Dewey in order to persuade Dewey to vote in favor of the Union in the February 28, 1996 election. Dewey, who did not vote in the earlier October 18, 1995 election, was viewed as an undecided voter by several employees. J.A. at 162; 168.

Vassar and Dewey became friends shortly after Dewey began working at Dickinson when they discovered they shared common religious beliefs. J.A. at 206 (Vassar Test.); 269 (Dewey Test.). Their friendship extended beyond the workplace, and they frequently socialized outside the workplace. J.A. 205–07 (Vassar Test.); 269–70 (Dewey Test.). In early November of 1995, Vassar learned that Dewey did not have a winter jacket, that he could not afford a jacket, and that he would soon be visiting relatives to the north where the weather was likely to be especially cold. J.A. 208–10 (Vassar Test.). She soon thereafter gave to Dewey a winter jacket of approximately $39 in value as a gift. J.A. at 208–10 (Vassar Test.); 271–72 (Dewey Test.). When giving Dewey the jacket, she did not say anything about the Union. J.A. at 208–10 (Vassar Test.); 272 (Dewey Test.). At this time, the Board had not yet ordered a hearing on the Union's objection to the October 18, 1995 decertification election, let alone recommended a second decertification election.

Vassar also acted generously toward Dewey, as well as other Dickinson employees, on other occasions. In late January of 1996, Vassar prepared Dewey's taxes for free. J.A at 164–65. Vassar testified that she had previously prepared other employees' tax returns for free or for a minimal fee, and has been doing so for several years. J.A. at 232–34 (Vassar Test.). In addition to assisting employees with their tax returns, Vassar, who bakes and sells cakes on a professional basis, has offered her co-workers free cakes or cakes at a substantial discount, which she began doing prior to becoming union steward. J.A. at 157 (Reames Test.); 213, 219–29 (Vassar Test.). On Valentine's Day, two weeks prior to the February decertification election, Vassar baked a cake for Dewey and several other Dickinson employees, including employees not eligible to vote in the decertification election. J.A. at 154 (Reames Test.); 259 (Vassar Test.). Finally, Vassar frequently paid for Dewey's meals or movies when they socialized outside of work, J.A. at 234 (Vassar Test.), as well as the breakfasts and lunches of other employees, something the employees do "for each other." J.A. at 230–31 (Vassar Test.). Subsequent to the February election, Vassar has continued to pay for other employees' meals, including Dewey's. J.A. at 230–31, 234 (Vassar Test.).

 An election will be set aside on the basis of misconduct by a union or one of its agents only where the misconduct of the Union or its agent " 'reasonably tend[s] to interfere with the employees' free and uncoerced choice in the election.' " *See NLRB v. Superior Coatings, Inc.,* 839 F.2d 1178, 1180 (6th Cir.1988) (quoting *Baja's Place, Inc. v. Hotel, Motel, Restaurant Employees Local 24,* 268 NLRB 868, 1984 WL 36040, *2 (N.L.R.B. Feb. 13, 1984)); *see also Dayton Hudson Dep't Store Co. v. NLRB,* 79 F.3d 546, 550 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996).

Discrediting the subjective views of several employees who testified that they were aware of Vassar's acts of generosity toward Dewey and that they viewed such acts as an attempt to persuade Dewey to vote in support of the Union, the hearing officer concluded that Dickinson failed to demonstrate that Vassar's actions reasonably tended to interfere with the employees' free choice. J.A. at 26 (Hr'g Officer's R & R at 4). Dickinson argues that the hearing officer erred in discrediting the subjective views of its witnesses and should have considered their views "presumptively reasonable and 'objective.'" Resp't/Cross–Appellant's Br. at 18. In evaluating whether alleged misconduct tended to interfere with employees' free choice, the Board applies an objective test. *See Sunrise Rehabilitation Hosp.*, 320 N.L.R.B. 212, 212, 1995 WL 791954, *2 (Dec. 19, 1995). *Accord Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 907 (6th Cir.1997). The subjective reactions of employees, like the subjective intent of the alleged wrongdoer, are not dispositive. *See NLRB v. Wis-Pak Foods, Inc.*, 125 F.3d 518, 524 (7th Cir. 1997); *see also Torbitt*, 123 F.3d at 907 (stating that an employee's subjective reaction does not render the challenged conduct unlawful). "When these subjective reactions are solicited by [a party] and are expressed long after the election, as they were here, they are not likely to command persuasive respect." *Bridgeport Fittings, Inc. v. NLRB*, 877 F.2d 180, 185 (2d Cir.1989); *see also Harlan No. 4 Coal Co. v. NLRB*, 490 F.2d 117, 122–23 (6th Cir.1974) ("[W]e are mindful of the dangers of permitting otherwise valid elections conducted by secret ballot to be set aside because some voters, after post-election introspection and in response to inquiry by their employers, believe that their votes may have been improperly influenced."), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). Rather, whether the alleged misconduct was reasonably likely to interfere with employees' free choice depends on objective facts, such as the timing of the allegedly improper act, the capacity of the actor, and similar prior acts. Applying an objective test, we believe substantial evidence supports the finding that Dickinson's employees would reasonably consider Vassar's gifts to Dewey, when viewed against the backdrop of prior acts of generosity toward fellow employees, as acts of friendship and not an attempt to "bribe" Dewey into supporting the Union. We therefore will not disturb the Board's conclusion that Vassar's actions do not warrant setting aside the election.[1]

## B

Shortly before the February decertification election, the Union held an open meeting at which it distributed T-shirts stating "All things in life are negotiable. Vote Union yes." Dickinson alleges that the Union's distribution of these T-shirts served as an economic inducement or reward for supporting the Union.

Although the distribution of rewards or economic inducements generally constitutes objectionable conduct, *see, e.g., NLRB v. Madisonville Concrete Co.*, 552 F.2d 168 (6th Cir.1977); *Owens–Illinois, Inc., Forest Prods. Group v. United Food Local 210*, 271 N.L.R.B. 1235, 1984 WL 36733, *2 (1984) (setting aside election where gifts of union jackets valued at $16 were distributed during voting sessions on election day and reasonably could have appeared to the voting employees "as a reward for those who had voted for the [Union] and as an inducement for those who had not yet voted to do so in the [Union's] favor"), the distribution of inexpensive campaign propaganda is permissible. *See NLRB v. Wintz Distrib. Co.*, 103 F.3d 130, 1996 WL 694150, *6 (6th Cir. Dec.3, 1996) (unpublished) (recognizing with approval the Board's policy of treating the distribution of inexpensive campaign materials as permissible conduct). Because pro-union T-shirts are inexpensive items, the Board does not consider the distribution of such T-shirts

1. Dickinson argues that the Board and the hearing officer erred in crediting Vassar's testimony. "The assignment of credibility to witnesses is the prerogative of the Board," and this court will not disturb the Board's credibility determinations unless clearly in error. *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 905 (6th Cir.1997). After reviewing Vassar's testimony, we see no reason to disturb the hearing officer's and the Board's conclusion that Vassar was a credible witness.

an interference with employee free choice, especially where the wearing of the T-shirts serves a union's campaign interest in distributing propaganda. *See Nu Skin Int'l, Inc.,* 307 N.L.R.B. 223, 223–24, 1992 WL 87489, *2 (April 22, 1992). Relying on *Nu Skin International,* the hearing officer held that the Union's distribution of the T-shirts was not objectionable. J.A. at 28. We agree that the distribution of inexpensive pro-union T-shirts more properly constitutes campaign propaganda than bribes or other attempts to buy votes. *See NLRB v. Adams Mfg. Co.,* 129 F.3d 1264, 1997 WL 720415, *2 (6th Cir. Nov. 14, 1997) (unpublished); *cf. NLRB v. Coca–Cola Bottling Co. Consol.,* 132 F.3d 1001 (4th Cir.1997) (distribution of pro-union T-shirts of nominal value at a union meeting prior to election did not result in undue influence). We therefore hold that the Board reasonably concluded that Dickinson failed to show that the Union's distribution of T-shirts so tainted the conditions of the February election as to interfere with the employees' fair and free choice of their bargaining representative.

### C

In *Milchem, Inc.,* 170 N.L.R.B. 362 (January 1, 1968), the Board announced that in the interest of avoiding "the potential for distraction, last minute electioneering or pressure, and unfair advantage," it will set aside an election where a party engages in "prolonged conversations" with voters without inquiring into the nature of the conversations. *Id.* at 362–63. The Board, however, does not apply this rule without exception, but "application of this rule [is] informed by a sense of realism." *Id.* at 363. Consequently, the *Milchem* standard "does not mean that any chance, isolated, innocuous comment or inquiry by an employer or union official to a voter will necessarily void the election." *Id.*

During the February decertification election, Vassar served as the Union's election observer. During the voting period, Vassar made comments to several employees in the polling area. In two instances, these employees were not eligible to vote, and no other eligible voters were present when Vassar spoke to these employees, with the exception of Emmy Deitz, an election observer, who had already voted when the conversations took place. Vassar told Nancy Andersen, Dickinson's observer, that she believed Andersen would vote in support of the Union if she were eligible to vote. J.A. at 195 (Andersen Test.). As a nonunit employee, Andersen was ineligible to vote. Vassar also spoke with Jill Ripma, a temporary employee who also was ineligible to vote, similarly commenting that Ripma would vote for the union if she could vote. J.A. at 196 (Andersen Test.). Because both comments were brief, directed at employees ineligible to vote, and not made in the presence of voting employees who had not yet voted, the hearing officer concluded that Vassar's comments to Andersen and Ripma did not violate the *Milchem* prohibition against electioneering. J.A. at 29. We agree. *Cf. NLRB v. Bostik Div., USM Corp.,* 517 F.2d 971, 975 (6th Cir.1975) (alleged occurrence could not have influenced the election's outcome where affected employee had already voted).

When employee David Sinke came to vote, Vassar purposefully mispronounced his name "Stinky," a nickname other employees had used in the past when referring to Sinke. J.A. at 181 (Sinke Test.). Contrary to Dickinson's claims, there was no testimony indicating the presence of other voters in the polling area when Vassar made these remarks. J.A. 242 (Vassar Test.); 187 (Sinke Test.).[2] Vassar testified that Sinke had never liked her, and that the two have never gotten along. J.A. at 241 (Vassar Test.). Vassar explained that she calls Sinke names as a means of irritating him in order to "get

---

**2.** Dickinson Press contends that employee Pete Pell was behind Sinke when Vassar made her comments to Sinke. *See* Resp't/Cross–Appellant's Br. at 41. However, Sinke could not recall whether Pell was behind him when Vassar called him "Stinky." He could only recall that Pell was in line behind him when he exited the voting

booth. J.A. at 187 (Sinke Test.). When asked whether he noticed any other employees in the room when Vassar called him "Stinky," Sinke replied, "No." *Id.* He could recall only Nancy Andersen, Vassar, and the Board agent, Alex Kassel, in the room. *Id.*

back at him" for his perceived mistreatment of her. J.A. at 240–42 (Vassar Test.). The conflict between Vassar and Sinke does not appear to stem from their opposing views on union representation. J.A. at 246 (Vassar Test.). The hearing officer concluded that Vassar's comment could not have caused Sinke to vote for the Union given the nature of the comment and Sinke's known opposition to the Union. J.A. at 30.

In mispronouncing Sinke's name as "Stinky," Vassar did not engage in "prolonged conversation" but made only brief remarks. Where the challenged incident does not involve prolonged conversation, the *Milchem* standard is inapplicable, and the Board "makes a judgment, based on all the facts and circumstances, whether the electioneering substantially impaired the exercise of free choice so as to require the holding of a new election." *Glacier Packing Co.*, 210 N.L.R.B. 571, 573 n. 5, 1974 WL 4938, *4 (May 13, 1974) (cited in *Wintz Distrib.*, 1996 WL 694150 at *3); (*see also Boston Insulated Wire & Cable Sys., Inc. v. NLRB*, 703 F.2d 876, 881 (5th Cir.1983), *reh'g denied*, 708 F.2d 720 (1983)). Although Vassar's remarks were inappropriate and offensive, we believe the hearing officer and the Board reasonably determined that her remarks were "innocuous" conversation and not electioneering in that they were not designed to influence Sinke's vote, nor were they remotely likely to influence his vote. *Cf. NLRB v. Oesterlen Servs. for Youth, Inc.*, 649 F.2d 399, 399–400 (6th Cir.1981) (concluding that Union's observer exchanging pleasantries with almost every voter "constitute[d] nothing more than 'innocuous' conversation that did not constitute electioneering").

Finally, when employee Scott Baas arrived to vote, Vassar allegedly asked to vote then too but was told by the Board's representative that she had to wait. J.A. at 175 (Baas Test.). The Company fails to explain why such a brief statement would have a tendency to create a coercive environment tending to interfere with Baas's free choice. We therefore agree with the Board that this remark also should be considered a fleeting and innocuous comment falling outside the *Milchem* prohibition.

**D**

■ At the time of the election, Lloyd Lajueness was temporarily assigned to the position of shipping clerk. J.A. at 149 (Lajueness Test.). The day before the election, Cindy Powell, a Union supporter, allegedly told Lajueness that he could lose his position if the Union lost. J.A. at 145, 149. Although Powell was a known Union supporter, at no time did she act as an agent of the Union.

■ The misconduct of a third party will cause an election to be set aside only where the act was " 'sufficiently substantial in nature to create a general environment of fear and reprisal such as to render a free choice of representation impossible.' " *Superior Coatings*, 839 F.2d at 1180 n. 1 (quoting *Hickman Harbor Serv. v. NLRB*, 739 F.2d 214, 220 (6th Cir.1984)); *see also Duriron*, 978 F.2d at 258. The misconduct of a third party is given less weight than that of a Union agent in determining whether an election should be set aside. *See Superior Coatings*, 839 F.2d at 1180. The Board and the courts give less weight to the acts of third parties because of the inability of unions and employers to prevent misconduct by persons over whom they have no control. *See Matlock Truck Body and Trailer Corp. v. NLRB*, 495 F.2d 671, 673 (6th Cir.1974).

Applying this standard, the hearing officer concluded that Powell's comment did not warrant setting aside the election. J.A. at 27. No testimony established that Powell had any authority to affect Lajueness's job status, nor did Dickinson present any testimony demonstrating how, if at all, the outcome of the election could impact Lajueness's position. Under these facts, the hearing officer justifiably concluded that Lajueness and other employees hearing of Powell's comments could not reasonably believe that Powell's "threat" would be carried out. J.A. at 27. Accordingly, we hold that substantial evidence supports the hearing officer's finding that Powell's comment was not likely to create a general environment of fear and reprisal rendering a free choice of representation impossible.

## CONCLUSION

For the reasons expressed above, we GRANT the Board's petition for enforcement and DENY Dickinson's cross-petition for review.