NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0743n.06
Filed: August 24, 2005

Nos. 04-1425, 04-1590

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

COOPER TIRE & RUBBER COMPANY, )
                                               )
      Petitioner/Cross-Respondent,       )     PETITION FOR REVIEW AND
                                               )     CROSS-PETITION FOR
                                             )     ENFORCEMENT FROM THE
      vs.                                      )     NATIONAL LABOR
                                             )     RELATIONS BOARD
NATIONAL LABOR RELATIONS BOARD, )
                                               )
      Respondent/Cross-Petitioner     )

_____

**Before: BATCHELDER and COLE, Circuit Judges, and OBERDORFER,** [*] **District Judge.**

**OBERDORFER**, District Judge. Petitioner, Cooper Tire & Rubber Co. ("Cooper"), seeks review of the March 25, 2004 Decision and Order of the National Labor Relations Board (the "Board") finding that Cooper violated Section 8(a)(5) of the National Labor Relations Act, as amended 29 U.S.C. § 158(a)(5), by unlawfully refusing to bargain with the International Brotherhood of Electrical Workers Local 1634 (the "Union"). *See Cooper Tire & Rubber Co.*, 341 N.L.R.B. No. 64, 2004 WL 670822 [hereinafter 2004 Order]. The Board cross-petitions for enforcement of the 2004 Order.

Cooper refuses to recognize the Union as the representative of the employees at its Cedar Rapids, Iowa, facility, alleging that the Board's certification of the Union as the exclusive bargaining representative was based on the results of an improperly-ordered December 3, 2003

_____

[*] The Hon. Louis F. Oberdorfer, United States District Court for the District of Columbia, sitting by designation.

election. Instead, according to Cooper, the Board should have certified the results of a January 31, 2003 election, in which the Union failed to attain majority support. Following the January 31, 2003 election, the Union filed an objection, alleging that Cooper engaged in misconduct by threatening employees with the loss of a significant bonus if they voted to unionize. A hearing officer, after a hearing on the objection, agreed with the Union, finding that Cooper's preelection conduct violated Section 8(a)(1) of the Act. The Board adopted the hearing officer's findings *in toto*, invalidated the election and directed a second election. *See Cooper Tire & Rubber Co.*, 340 N.L.R.B. No. 108 2003 WL 22465848 [hereinafter 2003 Order]. The Union received majority support in the second election, which the Board certified over Cooper's objections.

Because we find that substantial evidence supported the Board's finding that Cooper's conduct before the January 31, 2003 election violated Section 8(a)(1) of the Act, and its finding that Cooper failed to bargain in good faith after the Board certified the results of the properly ordered second election, we deny Cooper's petition for review and grant the Board's cross-petition for enforcement.

# I.

Cooper is a Delaware corporation with its principal place of business in Findlay, Ohio. Cooper manufactures and distributes to customers, tires and other rubber equipment for passenger and commercial vehicles. Cooper operates four warehouses, including one in Cedar Rapids, Iowa, where it employees a General Manager, Todd Lemke, three other supervisors, and twelve warehouse employees.

## A. The ROAM Bonus Program

Among other employee benefits, Cooper maintains an annual employee bonus program known as the "ROAM" bonus (an acronym for Return on Assets Managed). At the beginning of

each year, Cooper sets a projected ROAM target;[1] the ROAM bonus is based on how well Cooper performs in comparison to this goal and is awarded as a percentage of an eligible employee's salary. All of Cooper's salaried employees, including all of the warehouse employees at its Cedar Rapids facility, who are on the payroll on December 31 of the year in which the bonus is earned are eligible to participate in the ROAM bonus program. None of Cooper's unionized employees participate in the program. The bonus is distributed to all eligible employees in mid- to late February of the subsequent year, following a vote of Cooper's Board of Directors approving the amount of the bonus. The amount of the ROAM bonus varies each year. For example, for the years 1997 - 2001, the bonus ranged between 1.38% and 3.65% of eligible employees' base salaries. The 2002 bonus was significantly higher at 6.2%.

**B.      Pre-election Activity**

On December 22, 2002, the Union filed a petition to represent the full-time regular and part-time warehouse employees at Cooper's Cedar Rapids facility. Pursuant to a stipulated election agreement, the Board-conducted election was scheduled for January 31, 2003. During the pre-election period, employees questioned Cooper's management about the effect union representation would have on their wages and benefits, including the ROAM bonus. For example, in mid-January, 2003, one employee asked the general manager, Todd Lemke, if employees would receive the 2002 ROAM bonus if the Union gained majority support. Lemke privately assured the employee that all those eligible would receive the 2002 bonus regardless of the outcome of the election. Subsequently, in response to this and other questions, Cooper prepared two question-and-answer

---

[1]Cooper calculates the ROAM by adding Cooper's pretax profit and income on interest, subtracting state and local taxes, and dividing that number by Cooper's average controllable assets.

memoranda for distribution to all eligible voters. One memo was distributed on January 17, 2003; the other on January 27, 2003. According to Cooper, the memoranda addressed the major concerns expressed by its employees about the impending election.

The January 17 memorandum included questions and answers pertaining to the voting and bargaining processes, and the potential effect of unionization on job security, work schedules and the number of sick days allowed. One of the questions asked whether employees could lose benefits if the Union won the election. In response, Cooper stated that although wages and benefits could not be cut "simply because you voted in a union," employees could "end up with lower wages or elimination of benefits or privileges because of collective bargaining."

The January 27 memorandum contained twelve additional questions and answers dealing with such topics as who would negotiate for the unionized employees, what a steward's role would be, and how long collective bargaining for the first contract might take. The final question ("Question 22") addressed eligibility for the ROAM bonus. Specifically, the question and answer read as follows:

> Question 22: If the IBEW gets in here, will we still be eligible for the ROAM bonus?
>
> Answer: I don't know. Cooper has some unionized workers at other facilities and none of them participate in the ROAM bonus program. Cooper expects to announce the amount of the ROAM bonus for this year early next month. Early indications show that the ROAM bonus looks very promising this year.

When Cooper distributed the January 27 memorandum, although Cooper's employees had earned the 2002 ROAM bonus, the employees had not received the bonus, nor had Cooper's Board of Directors given its final approval to the amount of that bonus.

4

Shortly either before or after the issuance of the January 27 memorandum, but before the January 31, 2003 election,[2] Lemke held a meeting of Cedar Rapids warehouse employees during which he informed the voting employees that the 2002 ROAM bonus was expected to be around 6.2%, subject to the Board of Directors' approval. Specifically, Lemke stated "you can count on 6-ish payable . . . mid- to late February." Lemke made no statements with respect to the affect of the Union vote on receipt of the 2002 bonus.

On January 31, 2003, the Board conducted the election. Six Cedar Rapids employees voted for unionization and six against, with no challenged ballots. Because the Union failed to attain majority support, the Board did not certify it as the collective bargaining representative. The Union filed an objection to the voting results, contending that a new election should be held for the Cedar Rapids facility because Cooper unduly influenced the result of the first election by threatening voting employees with the loss of the 2002 ROAM bonus if they elected to unionize.[3]

C.    Board Review of Initial Election

A hearing officer conducted a hearing on the Union's objection on March 4, 2003. Thereafter, he issued a report and recommendation in which he found merit to the Union's objection and recommended that the result of the election be set aside. In reaching that conclusion, he found that Question 22 was objectionable because it reasonably would have led employees to believe that receipt of the 2002 bonus was in jeopardy if they voted to unionize. He rejected Cooper's arguments

---

[2]The evidence as to the exact date of the facility-wide meeting is mixed. Given the state of the record, the hearing officer declined to determine when the meeting occurred. Similarly, in its 2003 Order, the Board did not make a finding on the question of when the meeting took place, concluding that the answer to that question was not material to the outcome of the case.

[3]The Union initially filed two objections to the election but withdrew one on February 20, 2003.

that employees could only understand the statement in the January 27 memorandum as referring to future bonuses (*i.e.* those earned in 2003 and thereafter), rather than all ROAM bonuses (including the 2002 bonus). He concluded that the Union was not required to introduce evidence that employees actually believed that their 2002 ROAM bonus was contingent on the outcome of the election, noting that "[t]he test is whether employees reasonably would believe that they could lose an existing benefits as a result of unionization, not the actual effect on the employees." Furthermore, the hearing officer found that Lemke's statement to employees at the facility-wide meeting concerning the 2002 bonus did not repudiate or clarify the objectionable conduct because it "did not clearly indicate that the bonus would be paid to the unit employees regardless of the election." Finally, the hearing officer found that "although [Cooper] explicitly informed 1 unit employee that the 2002 ROAM bonus would be paid to employees regardless of the outcome of the election, this left the remaining 11 unit employees unclear as to what would happen, in circumstances where a single-vote shift could have affected the outcome of the election."

Cooper sought Board review of the hearing officer's report and recommendation. On October 28, 2003, the Board adopted the hearing officer's finding of employer interference and directed a second election.[4] In accordance with its 2003 Order, the Board conducted a second election on December 3, 2003. This time, the Union prevailed by a vote of seven to four, with one challenged ballot going uncounted. Shortly thereafter, in the absence of any objections to the second

---

[4]Chairman Battista dissented, disagreeing with the majority's findings that Question 22, taken in context, was sufficiently coercive to have a reasonable tendency to interfere with the employees' free choice. On the contrary, he found that "the employees reasonably understood that they definitely would receive a bonus for 2002, and that if the Union were selected future bonuses would not necessarily be given."

6

election, the Regional Director certified the Union as the exclusive bargaining representative of Cooper's Cedar Rapids facility warehouse employees.

## D.      Board Review of Cooper's Refusal to Bargain After Second Election

After its certification, the Union requested that Cooper commence bargaining. Cooper refused and the Union filed an unfair labor practice charge. On March 25, 2004, the Board issued a second Decision and Order, finding that Cooper's refusal to bargain with the Union violated Sections 8(a)(5) and 8(a)(1) of the Act. The Board concluded that all representation issues raised by Cooper in the unfair labor practice proceeding were, or could have been, litigated in the underlying representation proceeding. This timely appeal followed.

## II.

On appeal, Cooper argues that it has no duty to bargain with the Union because the Union's certification as the exclusive bargaining representative was based upon the results of an improperly-ordered second election.[5] Specifically, Cooper claims that the Board erred as a matter of law in its 2003 Order because: (1) the Board departed from its own precedent without explanation in ruling that a single, implied threat to take away an existing benefit was sufficient to overturn the results of a valid election; and (2) substantial evidence does not support the Board's finding that Question 22, viewed in the context of Cooper's other campaign statements, threatened the loss of the 2002 ROAM bonus. Consequently, in reviewing the Board's action, we shall first consider its 2003

---

[5]This Court cannot directly review the Board's ruling in a representation proceeding. *See NLRB v. V & S Schuler Eng'g, Inc.*, 309 F.3d 362, 367 n.5 (6th Cir. 2002). As a result, an employer seeking judicial review of election issues must first refuse to bargain with the victorious labor organization and then challenge the validity of the election in the ensuing unfair labor practice proceeding. *See id.*

Order, finding violations of section 8(a)(1) and directing a second election. We will then consider whether the 2004 bargaining order was warranted.

## A.    Departing from Precedent

Cooper first argues that the Board erred in its 2003 Order by departing from its own precedent without explanation. Citing *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34 (1st Cir. 1989), Cooper maintains that the law is clear that an agency cannot significantly depart from its own precedent without explicitly recognizing it is doing so and explaining why. In *Shaw's Supermarkets*, shortly before a union election, the employer told all employees that "if they were to turn their affairs over to" the union, they would be guaranteed "minimum wages and workmen's comp and that's where [the] collective bargaining process would begin." *Id.* at 34-35. Based on this statement, the Board refused to certify the results of the election and directed a second election. The Board moved for enforcement of its order. Citing several Board decisions finding that almost identical statements made under almost identical circumstances did not warrant a second election, the First Circuit reversed, holding that when the Board deviates "from well-established precedent as significantly as it has done here, it must, at least, explain the reasons for its deviation." *Id.* at 35.

Here, Cooper argues that the Board sustained the Union's objection and directed a second election based solely on its finding that an employee reasonably would have interpreted Question 22 as a threat to take away the 2002 ROAM bonus if the Union won the election. According to Cooper, as in *Shaw's Supermarkets*, under Board precedent, such a single, implied threat to eliminate an existing benefit was not sufficient to warrant a new election. We disagree.

8

Unlike *Shaw's Supermarkets*, there is no such clear line of contrary precedent governing this case.[6] In fact, contrary to Cooper's claims, there is authority supporting the Board's finding that a single, implied threat of retaliation is sufficient to taint an election. In *Siemens Mfg. Co.*, 322 NLRB 994 (1997), for example, the Board found that an employer's speech to employees reiterating the average wage increases and bonuses paid the previous five years, followed by a comment that if the employees voted to unionize, everything "is frozen until we reach an agreement at the negotiating table" was sufficiently coercive to taint the union election. *Id.* This Court also has held that a veiled threat of retaliation is sufficient evidence that an employer interfered with the employees' exercise of their rights in the context of a Union election. *See UFORMA/Shelby Bus. Forms*, Inc. v. NLRB, 111 F.3d 1284, 1295 (6th Cir. 1997) (noting that the fact that the employer did not enforce its threat or otherwise engage in objectionable conduct does not shield it from liability, because "the threat itself is the actionable wrong"); *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 279 (6th Cir. 1999) (noting that objectionable threats include insinuations by an employer that it will withhold or curtail a bonus or benefits in retaliation for unionization); *see also NLRB v. Island Film Processing Co.*, 784 F.2d 1446, 1451 (9th Cir. 1986) ("Implied threats of retaliation suffice to taint an election.").

Thus, the real issue in this case is not that the Board significantly departed from prior precedent but whether there was substantial evidence to support the Board's finding that Cooper's conduct violated Section 8(a)(1) of the Act.

---

[6]The *Shaw's Supermarkets* court recognized the uniqueness of the case before it, however, indicating that it was limiting its decision to cases in which the Board departs from "past cases" which "trace a relatively clear line." *Id.* at 39. It was not imposing on the Board "the time consuming obligation of microscopically examining prior cases; nor [] encourag[ing] counsel to examine past precedent with an eye towards raising hosts of legalistic arguments and distinctions." *Id.*

**B.     Substantial Evidence**

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [29 U.S.C. § 157]," which assures the right of employees "to bargain collectively through representatives of their own choosing." The test for determining whether an employer has violated section 8(a)(1) is "whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 105 (6th Cir. 1987). The party objecting to the election bears the burden of demonstrating that the employers' alleged conduct "interfered with the employees' free choice." *V & S Schuler Eng'g, Inc.*, 309 F.3d at 368; *see also Adair Standish Corp. v. NLRB*, 912 F.2d 854, 859 (6th Cir. 1990) (quoting *Okun Bros. Shoe Store, Inc.*, 825 F.2d at 105) (noting that " 'the total context in which the challenged conduct occurs' [is] viewed 'from the standpoint of its impact upon the employees'").

Here, Cooper argues that the Board erred in finding that its preelection conduct violated Section 8(a)(1). Specifically, Cooper claims that all of the statements contained in Question 22 were accurate and, read together, were not threatening or coercive but merely indicative of the uncertainty over the status of future bonuses should the employees vote to unionize. It further asserts that the Board failed to read Question 22 in the context of the other statements in its memoranda and its verbal assurances that employees could "count on" receiving their 2002 ROAM bonus. Finally, Cooper contends that the Board improperly disregarded significant contrary testimony by two employees that directly refuted the Union's claims, impermissibly shifting the burden of proof from the Union to Cooper.

Our review of the Board's decision is "quite limited.*" Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 905 (6th Cir. 1997). "Where there is substantial evidence in the record as a whole to

10

support the Board's conclusions, they may not be disturbed upon appeal." *Kux Mfg. Co. v. NLRB*, 890 F.2d 804, 808 (6th Cir. 1989). "Evidence is substantial when it is 'adequate, in a reasonable mind, to uphold the [Board's] decision.' " *V & S Schuler Eng'g, Inc.*, 309 F.3d at 367. In reviewing the Board's findings, we consider any contrary evidence but do not conduct a *de novo* review of the record. *NLRB v. Garon*, 738 F.2d 140, 141 (6th Cir. 1984) (noting that the Court is foreclosed from setting aside the Board's findings if they are supported by substantial evidence even though the Court may have reached a different conclusion had it originally decided the case). Thus, here, we must determine whether there is substantial evidence that Question 22, considered in the context of Cooper's other pre-election conduct, "tend[ed] to be coercive or tend[ed] to interfere with the employees' exercise of their rights." *Okun Bros. Shoe Store*, 825 F.2d at 105.

### 1.     Question 22

Cooper argues that Question 22 was not threatening because it legitimately indicated mere uncertainty about the employees' receipt of future bonuses. However, as the Board found, it is the uncertainty cast upon the employees' receipt of a bonus to which they were already fully entitled that makes the statement coercive. As the Board explained, the 2002 ROAM bonus was earned as of December 31, 2002, and stood on very different footing from future bonuses. Nevertheless, Question 22 did not differentiate between the 2002 bonus and future bonuses. Instead, it asked without qualification whether employees "will . . . still be eligible for *the* ROAM bonus?" (emphasis added). Cooper's answer immediately following the question--namely, "I don't know"--again failed to distinguish between the 2002 ROAM bonus and future bonuses, thereby placing into doubt the employees' receipt of the bonus they had already earned. The remaining portions of the statement arguably reinforced the threatening implication that all ROAM bonuses, including the 2002 bonus, would be in jeopardy if the employees unionized. Cooper combined a statement linking eligibility

11

for the bonus to the employees' union status--"Cooper has some unionized workers at other facilities and none of them participate in the ROAM bonus program"--with statements concerning the timing and amount of the 2002 bonus. Cooper then emphasized that the 2002 bonus was a benefit of significant value, while noting that it would not be approved until after the election results were known. Viewed through the prism of an employees' economic dependence, *see Torbitt & Castleman*, 123 F.3d at 906, it is reasonable to conclude that "employees certainly could reasonably infer that the bonus plan was contingent on their remaining nonunion." *Georgia-Pacific Corp.*, 325 NLRB 867, 867 (1998); *Advo Sys., Inc.*, 297 NLRB 926, 940 (1990) (holding that employer's answering question whether expected raises would be paid by saying "everything is negotiable" was objectionable when the employer knew that scheduled raises would be paid as scheduled).

## 2. Cooper's Memoranda and Verbal Assurances

The Board was not allowed to view Question 22 in isolation, though. Rather it was required to view this statement in the context of Cooper's other preelection activity. *See, e.g., Torbitt & Castleman*, 123 F.3d at 906. Cooper asserts that the Board failed to do so as it ignored Cooper's other statements in its campaign literature, including its unequivocal pronouncement that it could not remove existing benefits simply because of unionization, and its verbal assurances that the employees could "count on" receiving their 2002 ROAM bonus. Cooper maintains that the overriding theme of its preelection statements was the uncertain impact that the collective bargaining process might have on wages and benefits, *i.e.*, that future wages and benefits could go up, down, or remain the same.

With respect to the statements in the memoranda, the Board determined, however, that a reasonable employee would be more likely to be intimidated by the specific question about the

12

ROAM bonus than to be assured by the other general statements that Cooper could not cut employees' wages or benefits simply because they voted to unionize. We believe that this is a reasonable interpretation of the evidence, particularly given the context and the timing of the memoranda. *See generally Torbitt & Castleman*, 123 F.3d at 906 (holding that Board's reasonable interpretation will not be set aside even if reviewing court might have come to a different, more plausible, conclusion based on the evidence). Both memoranda were issued by Cooper in response to numerous questions it received from employees about the impending union election--including a specific question from at least one employee as to whether employees would still be eligible for the 2002 ROAM bonus. Instead of assuring employees that receipt of the 2002 bonus was not in jeopardy regardless of the election outcome, Cooper chose a much more ambiguous approach by asking a general question about the ROAM bonus and combining its answer as to future eligibility with specific information about the amount and timing of the 2002 bonus. The effect of this was, at the very least, to create confusion as to eligibility for the 2002 bonus, as illustrated by Cooper employee, James Schulze's testimony at the hearing that although he knew Cooper could not eliminate existing benefits, he interpreted Question 22 as "saying that if the union goes through that we may not be entitled to the bonus we already earned from the previous year." Furthermore, the January 27 memorandum was issued just days before the election, leaving little time for employees to clarify the apparently conflicting information. *See V & S Schuler Eng'g, Inc.*, 309 F.3d at 373 (noting that the Board must engage in closer scrutiny when the alleged unlawful actions occurred "on the doorstep of the election").

Cooper maintains, however, that even if Question 22 was ambiguous, Lemke's statement at the facility-wide meeting held shortly before the election clearly indicated to the employees that the

13

2002 ROAM bonus would be paid regardless of the outcome of the election. When an employer makes a statement that would reasonably be viewed as an objectionable threat of retaliation, it may still cure or dispel the threat. In order to do so, however, the employer must, at a minimum, give employees a "clear assurance" that it will behave lawfully and will not follow through with the conduct threatened earlier. *See Yuma Coca-Cola Bottling Co.*, 339 NLRB No. 14, 2003 WL 21236331, at \*2. Vague assurances of fair treatment or generalized statements that appear to contradict the earlier threat are insufficient to purge the coercive conduct. *See Noah's N.Y. Bagels*, 324 NLRB 266, 267 (1997); *see also Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419, 1430 (2d Cir. 1996) (noting that conduct repudiating a threat must be "timely, unambiguous, specific in nature to the coercive conduct and free from other proscribed illegal conduct").

It is unclear whether Lemke's meeting occurred before or after the distribution of the January 27 memorandum; it was an ineffective repudiation regardless. As the Board determined, if the facility-wide meeting occurred before January 27, the statements in the memorandum would call into doubt any representation by Lemke at the meeting. If the meeting occurred after distribution of the memorandum, it did nothing to dispel the coercive nature of Question 22. We agree with the Board that Lemke's statements at the meeting arguably served to reinforce the threat. That is, the statement may have heightened the coercive effect of the January 27 memorandum: highlighting the amount of the bonus and the fact that it would not be approved for disbursement until after the results of the election were known. Although Cooper's Board of Directors' vote was only to approve the amount of the bonus that had already been earned, based on Cooper's ambiguous statements, the employees reasonably could have believed that the Board of Directors had the power to refuse to approve the bonus if they voted to unionize. *Cf. Adair Standish Corp.*, 912 F.2d 854 at 860.

14

### 3. Contrary Testimony by Cooper Employees

Finally, Cooper asserts that the sole basis of the Union's objection--that employees reasonably would have believed that Question 22 constituted an implied threat by Cooper to take away the 2002 ROAM bonus if the Union won the election--was expressly refuted by the only additional evidence presented by the Union at the hearing. That evidence was the testimony of James Schulze that he understood from Cooper's campaign literature that it could not eliminate any existing benefit simply because the employees voted in the Union, *see supra*, at 13. Thus, Cooper maintains that because the Union's evidence consisted solely of a single, alleged threat and the testimony of a witness who disclaimed the threat, Cooper must prevail if the burden of proof is to have any meaning. Cooper argues that the statement of its witness, Mark Rondomanski, that Lemke specifically told him that Cooper could not take away the 2002 ROAM bonus further undermines the Union's claim.

Cooper, however, confuses the issue of whether there was substantial evidence to support the Board's decision and who properly bore the burden of proof. As the hearing officer and the Board explained, the appropriate "test is not whether the employee 'was in fact intimidated or coerced.' " *Torbitt & Castleman*, 123 F.3d at 907 (internal citations omitted). Instead, "the test to be applied is whether a remark can reasonably be interpreted by an employee as a threat." *Smithers Tire & Auto. Testing of Texas, Inc.*, 308 NLRB 72 (1992); *see also UFORMA/Shelby Bus. Forms*, 111 F.3d at 1294 (" '[T]he actual effect of a statement is not so important as its tendency to coerce.' ") (citation omitted). In *Torbitt & Castleman*, for example, we held that the hearing officer did not err in concluding that an employer's statement had the tendency to coerce despite the testimony of an employee indicating that he was not in fact coerced. *Id.* at 907 (noting that "an employee's subjective reaction does not render the threat lawful or unlawful"). Similarly, in *Smithers Tire*, the

Board determined that it was reasonable for an employee to construe a union official's remark that "[t]his is what happens when you cross us" as a threat, whether or not the employee actually construed it as such. *Id.* at 72.

Moreover, the Union presented additional evidence in support of its claims. In fact, despite Schulze's testimony that he did not believe Cooper could eliminate existing benefits, he stated that he interpreted Question 22 as "saying that if the union goes through that we may not be entitled to the bonus we already earned from the previous year." With respect to the testimony of Rondomanski that Lemke assured him, one-on-one, that employees would receive the 2002 bonus regardless of the vote outcome, the Board correctly observed that reliance on one employee's interpretation would be especially inappropriate where, as here, the outcome of the election could have been altered by a single vote.

The Board found Cooper's preelection conduct, specifically, its distribution of the January 27 memorandum that called into question the employees' receipt of the 2002 ROAM bonus if the employees voted to unionize, interfered with the results of the election. The Board had support for this finding. Thus, we will not disturb Board findings that Cooper violated Section 8(a)(1) of the Act. *See generally Timsco Inc. v. NLRB*, 819 F.2d 1173, 1178 (D.C. Cir. 1987) ("[T]he line between prediction and threat is a thin one, and in the field of labor relations that line is to be determined by context and the expertise of the Board.").

**E.    2004 Order**

Having concluded that substantial evidence supported the Board's finding that Cooper's preelection conduct violated Section 8(a)(1), we hold that Cooper failed to bargain with the Union in good faith after the Board certified the results of the properly ordered December 3, 2003 election,

16

in violation of Section 8(a)(5).  Accordingly, we DENY Cooper's petition for review of the Board's

2004 Order and GRANT the Board's cross-petition for enforcement.

**Batchelder, J. dissenting.** I respectfully dissent because, unlike the majority, I do not think that substantial evidence supports the NLRB's conclusion that the statements contained in Question #22 interfered with the employees' right to elect a labor union. In the days leading up to the election, Todd Lemke, the General Manager of Cooper's Cedar Rapids warehouse, prepared two question-and-answer style memoranda (dated January 17, 2003 and January 27, 2003) for distribution to the employees. The NLRB found that the twenty-second question and answer in the second memo violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) by suggesting that management would not honor its commitment to pay the 2002 ROAM bonus if the employees agreed to unionize. This question and answer says:

> *QUESTION # 22*: If the [Union] gets in here, will we still be eligible for the ROAM bonus?
>
> *ANSWER*: I don't know. Cooper has some unionized workers at other facilities and none of them participate in the ROAM bonus program. Cooper expects to announce the amount of the ROAM bonus for this year early next month. Early indications show that the ROAM bonus looks very promising this year.

A union seeking to overturn the results of a representation election carries "the burden of showing that the election was not conducted fairly." *NLRB v. Superior Coatings*, *Inc*., 839 F.2d 1178, 1180 (6th Cir. 1988). "When preelection conduct is claimed to have made a representation unfair, the party seeking to overturn the election must show that unlawful acts interfered with employees' free choice and significantly affected the election results. The objector must show that the misconduct tended to prevent a fair election." *NLRB v. V& S Schuler Engineering, Inc*., 309 F.3d 362, 368 (6th Cir. 2002). We review for substantial evidence the NLRB's conclusion that an election did not reflect the free and fair choice of the employees. *NLRB v. Dickinson Press, Inc.,* 153 F.3d 282, 285 (6th Cir. 1998) (quoting *Mitchellace, Inc. v. NLRB,* 90 F.3d 1150, 1155 (6th Cir. 1996)).

The majority holds that by failing to "differentiate between the 2002 bonus and future bonuses," Lemke's answer to Question #22 cast doubt on whether Cooper would honor the employees' right to the 2002 ROAM bonus, thereby influencing the election results in violation of Section 8(a)(1) of the NLRA. But the majority provides no reason why Lemke should make this distinction, and neither it nor the NLRB cites to language in the memo indicating that Question #22 pertained to the 2002 ROAM bonus (as opposed to future ROAM bonuses). Because the Union carries the burden of proving that the election was not conducted fairly, *Superior Coatings*, 839 F.2d at 1180, we are not permitted to simply assume that Question #22 referenced the 2002 ROAM bonus. To the contrary, the most reasonable interpretation of Question #22 is that it pertains only to *future* ROAM bonuses inasmuch as it uses the future tense verb "will." Had the writer of Question #22 intended to inquire about the 2002 ROAM bonus specifically, he likely would have asked "*are* we still eligible?"

Nor do I believe that Lemke's answer to Question #22, "I don't know," had any coercive effect. The majority's opinion assigns great significance to Answer #22's statement that unionized workers at other Cooper Tire facilities do not participate in the ROAM bonus program and that the bonus "looks very promising this year." Though nothing in the record casts doubt on the factual accuracy of this statement, the majority thinks that it "arguably reinforced the threatening implication that all ROAM bonuses, including the 2002 bonus, would be in jeopardy if the employees unionized." However, nothing in Answer #22 provides the necessary causational link between the election of the Union and the revocation of the employees' 2002 bonuses. Though Answer #22 suggests that the employees' decision to unionize could ultimately *result* in their ineligibility to receive future ROAM bonuses, it contains no language to support the inference that

19

Cooper would revoke the ROAM bonus *in retaliation for* the employees' decision to unionize.[1]

Absent a link between ROAM eligibility and the employees' union status, Answer #22 may only be read as management's attempt to influence the outcome of the election by predicting that the workers at the Cedar Rapids plant, like their counterparts at other unionized Cooper facilities, would not obtain rights to receive the ROAM bonus through collective bargaining. Such predictions are entirely permissible. *Beverly Enterprises-Indiana, Inc.*, 281 NLRB 26, 31 (1986) ("an employer may attempt to influence the outcome of an election by presenting facts and even making predictions based on fact, as long as the employer avoids using its influence to interfere with employee rights of free association").

The Board's decision is even less defensible when we consider the context in which Question # 22 was asked and answered. In the January 17 memo, Lemke stated that Cooper would not cut employee benefits simply because they elected a union and James Schulze, an employee at the Cedar Rapids warehouse who served as the Union's election observer, testified that he understood that it was illegal for employers to retaliate against employees who supported a union. Moreover, it is undisputed that the employees knew that their right to receive the 2002 ROAM bonus had vested a month before the election. It seems highly unlikely that an employee who knew that 1) he had a legal right to receive the ROAM bonus and 2) it is illegal for employers to retaliate against

---

[1]The NLRB employed an erroneous legal standard in its failed attempt to link the possible revocation of the employees' 2002 ROAM bonus with their decision to elect a Union. *See First Healthcare Corp. v. N.L.R.B.*, 344 F.3d 523, 528 (6th Cir. 2003) ("[i]f the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has no basis in law") (internal quotation omitted). The Board found that "[b]y emphasizing that none of Cooper's unionized workers participate in the ROAM bonus program, the Employer *might* have caused employees reasonably to believe that their receipt of the bonus was conditioned on their choosing to remain nonunion." (Emphasis added). The Union cannot sustain its burden of proof by establishing that a fact of consequence "might" have happened.

20

employees because they supported a union, would think that Question #22 pertained to the 2002 ROAM bonus and interpret Lemke's ambiguous answer as a threat.

Because substantial evidence does not support the NLRB's conclusion that the Union carried its burden of proving that Cooper Tire engaged in coercive conduct that interfered with the employees' exercise of their right to obtain union representation, I would reverse.